[L.A. No. 30355. In Bank. Sept. 2, 1975.]

H. B. TAYLOR, Plaintiff, Cross-defendant and Respondent, v. ELIZABETH G. JOHNSTON et al., Defendants, Cross-complainants and Appellants.

## COUNSEL

West & Girardi, Daniel W. Gage, Thomas V. Girardi, Robert E. Courtney, Gibson, Dunn & Crutcher, Robert Forgnone and Wayne W. Call for Defendants, Cross-complainants and Appellants.

Iverson, Yoakum, Papiano & Hatch, Neil Papiano and Donald M. Robbins and Amici Curiae on behalf of Defendants, Cross-complainants and Appellants.

Walter S. Weiss, John Onesian, Long & Levit and Richard B. Wolf for Plaintiff, Cross-defendant and Respondent.

## OPINION

**SULLIVAN, J.**—In this action for damages for breach of contract defendants Elizabeth and Ellwood Johnston, individually and as copartners doing business as Old English Rancho, appeal from a judgment entered after a nonjury trial in favor of plaintiff H. B. Taylor and against them in the amount of $132,778.05 and costs.

Plaintiff was engaged in the business of owning, breeding, raising and racing thoroughbred horses in Los Angeles County. Defendants were engaged in a similar business, and operated a horse farm in Ontario, California, where they furnished stallion stud services. In January 1965 plaintiff sought to breed his two thoroughbred mares, Sunday Slippers and Sandy Fork to defendants' stallion Fleet Nasrullah. To that end, on January 19 plaintiff and defendants entered into two separate written contracts—one pertaining to Sunday Slippers and the other to Sandy Fork. Except for the mare involved the contracts were identical. We set forth in the margin the contract covering Sunday Slippers.[1]

---

[1] "Original

IMPORTANT
PLEASE SIGN ORIGINAL AND RETURN
AS QUICKLY AS POSSIBLE RETAINING
DUPLICATE FOR YOUR OWN FILE.

January 8, 1965

"OLD ENGLISH RANCHO
Route 1, Box 224-A
Ontario, California 91761
"Gentlemen:
"I hereby confirm my reservation for one services to the stallion FLEET NASRULLAH

The contract provided that Fleet Nasrullah was to perform breeding services upon the respective mares in the year 1966 for a fee of $3,500, payable on or before September 1, 1966. If the stud fee was paid in full and the mares failed to produce a live foal (one that stands and nurses without assistance) from the breeding a return breeding would be provided the following year without additional fee.

On October 4, 1965, defendants sold Fleet Nasrullah to Dr. A. G. Pessin and Leslie Combs II for $1,000,000 cash and shipped the stallion to Kentucky. Subsequently Combs and Pessin syndicated the sire by selling various individuals 36 or 38 shares, each share entitling the holder to breed one mare each season to Fleet Nasrullah. Combs and Pessin each reserved three shares.

On the same day defendants wrote to plaintiff advising the latter of the sale and that he was "released" from his "reservations" for Fleet Nasrullah.[2] Unable to reach defendants by telephone, plaintiff had his attorney write to them on October 8, 1965, insisting on performance of the contracts. Receiving no answer, plaintiff's attorney on October 19 wrote a second letter threatening suit. On October 27, defendants advised plaintiff by letter that arrangements had been made to breed the two mares to Fleet Nasrullah in Kentucky.[3] However, plaintiff later

for the year 1966.
"TERMS: $3,500.00—GUARANTEE LIVE FOAL.
"FEE is due and payable on or before Sept. 1, 1966.
"IF stud fee is paid in full, and mare fails to produce a live foal (one that stands and nurses without assistance) from this breeding, a return breeding the following year to said mare will be granted at no additional stallion fee.
"FEE is due and payable prior to sale of mare or prior to her departure from the state. If mare is sold or leaves the state, no return breeding will be granted.
"STUD CERTIFICATE to be given in exchange for fees paid.
"VETERINARIAN CERTIFICATE due in lieu of payment if mare is barren.
 "I hereby agree that OLD ENGLISH RANCHO shall in no way be held responsible for accidents of any kind or disease.

 Mr. H. B. Taylor

"Mare: SUNDAY SLIPPERS 112 North Evergreen Street
Roan filly 1959
MOOLAH BUX-MAOLI-ORMESBY Burbank, California 91505
"(Veterinary certificate must accompany all barren mares.)
"Stakes winner of $64,000.00
last raced in 1962 /s/ H. B. Taylor"

[2] Defendants' letter stated in part: "We wish to inform you that FLEET NASRULLAH has been sold and will stand the 1966 season in Kentucky. You are, therefore, released from your reservations made to the stallion."

[3] Defendants' letter stated in part: "Mr. Johnston has made arrangements for you to breed SANDY FORK . . . and SUNDAY SLIPPERS . . . to FLEET NASRULLAH for the 1966 season. Therefore, you should communicate with Dr. A. G. Pessin of Spendthrift Farm, Lexington, Kentucky, to finalize breeding arrangements. . . ."

learned that the mares could not be boarded at Spendthrift Farm where Fleet Nasrullah was standing stud and accordingly arranged with Clinton Frazier of Elmhurst Farm to board the mares and take care of the breeding.

In January 1966 plaintiff shipped Sunday Slippers and Sandy Fork to Elmhurst Farm. At that time, however, both mares were in foal and could not be bred, since this can occur only during the five-day period in which they are in heat. The first heat period normally occurs nine days, and the second heat period thirty days, after foaling. Succeeding heat periods occur every 21 days.

On April 17, 1966, Sunday Slippers foaled and Frazier immediately notified Dr. Pessin. The latter assured Frazier that he would make the necessary arrangements to breed the mare to Fleet Nasrullah. On April 26, the ninth day after the foaling, Frazier, upon further inquiry, was told by Dr. Pessin to contact Mrs. Judy who had charge of booking the breedings and had handled these matters with Frazier in the past. Mrs. Judy, however, informed Frazier that the stallion was booked for that day but would be available on any day not booked by a shareholder. She indicated that she was acting under instructions but suggested that he keep in touch with her while the mare was in heat.

Sunday Slippers came into heat again on May 13, 1966. Frazier telephoned Mrs. Judy and attempted to book the breeding for May 16.[4] She informed him that Fleet Nasrullah had been reserved by one of the shareholders for that day, but that Frazier should keep in touch with her in the event the reservation was cancelled. On May 14 and May 15 Frazier tried again but without success; on the latter date, Sunday Slippers went out of heat.

On June 4, the mare went into heat again. Frazier again tried to book a reservation with Fleet Nasrullah but was told that all dates during the heat period had been already booked. He made no further efforts but on June 7, on plaintiff's instructions, bred Sunday Slippers to a Kentucky Derby winner named Chateaugay for a stud fee of $10,000.

Sandy Fork, plaintiff's other mare awaiting the stud services of Fleet Nasrullah, foaled on June 5, 1966. Frazier telephoned Mrs. Judy the next

---

[4]Frazier did not seek to breed Sunday Slippers on May 13, 1966, because the mare's follicle had not yet ruptured; conception can occur up to 12 hours after rupture of the follicle. Accordingly, Frazier normally tried to book a breeding for three days after the onset of heat.

day and received a booking to breed the mare on June 14, the ninth day after foaling. On June 13, 1966, however, she cancelled the reservation because of the prior claim of a shareholder. Frazier made no further attempts and on June 14 bred Sandy Fork to Chateaugay.

Shortly after their breeding, it was discovered that both mares were pregnant with twins. In thoroughbred racing twins are considered undesirable since they endanger the mare and are themselves seldom valuable for racing. Both mares were therefore aborted. However, plaintiff was not required to pay the $20,000 stud fees for Chateaugay's services because neither mare delivered a live foal.

The instant action for breach of contract proceeded to trial on plaintiff's fourth amended complaint, which alleged two causes of action, the first for breach of the two written contracts, the second for breach of an oral agreement. Defendants' cross-complained for the stud fees. The court found the facts to be substantially as stated above and further found and concluded that by selling Fleet Nasrullah defendants had "put it out of their power to perform properly their contracts," that the conduct of defendants and their agents Dr. Pessin and Mrs. Judy up to and including June 13, 1966, constituted a breach[5] and plaintiff "was then justified in treating it as a breach and repudiation of their contractual obligations to him," and that defendants unjustifiably breached the contracts but plaintiff did not.[6] The court awarded plaintiff damages for defendants' breach in the sum of $103,122.50 ($99,800 net damage directly sustained plus $3,322.50 for reasonable costs and expenses for mitigation of damages). "Because of defendants' wholly unwarranted, high-handed, and oppressive breach of their contractual

---

[5]We set forth the significant paragraph of the findings at length: "When defendants sold Fleet Nasrullah in 1965 to a purchaser who shipped him to Kentucky, defendants put it out of their power to perform properly their contracts with plaintiff. Those contracts did not require that plaintiff's rights to the breeding services of Fleet Nasrullah should be relegated to a secondary or subordinate position to that of any other person, whether he be a holder of shares in the stallion or not. No such conditions were stated in the contracts and none can be inferred therefrom. From the conduct of the defendants, their agent Dr. Pessin, and their subagent Mrs. Judy, plaintiff was justified in concluding that the defendants were just giving him the runaround and had no intention of performing their contract in the manner required by its terms and as required by the covenant of good faith and fair dealing. Their conduct and that of their agent Dr. Pessin, and their subagent Mrs. Judy up to and including June 13, 1966 constituted a breach of defendants' breeding contracts with plaintiff (plaintiff's Exhibits 8, 9 and 10) and plaintiff was then justified in treating it as a breach and repudiation of their contractual obligation to him."

[6]The court concluded that "The defendants unjustifiably breached these contracts; the plaintiff did not breach these contracts."

obligation to plaintiff, the plaintiff is entitled to recover from the defendants pre-judgment interest at the rate of 7% per annum on the sum of $99,800.00 from August 1, 1968 . . . ." It was concluded that defendants should take nothing on their cross-complaint. Judgment was entered accordingly. This appeal followed.

Defendants' main attack on the judgment is two-pronged. They contend: first, that they did not at any time repudiate the contracts; and second, that they did not otherwise breach the contracts because performance was made impossible by plaintiff's own actions. To put it another way, defendants argue in effect that the finding that they breached the contracts is without any support in the evidence. Essentially they take the position that on the uncontradicted evidence in the record, as a matter of law there was neither anticipatory nor actual breach. As will appear, we conclude that the trial court's decision was based solely on findings of anticipatory breach and that we must determine whether such decision is supported by the evidence.

Nevertheless both aspects of defendants' argument require us at the outset to examine the specifications for performance contained in the contracts. (See fn. 1, *ante.*) We note that the reservation for "one services" for Fleet Nasrullah was "for the year 1966." As the evidence showed, a breeding is biologically possible throughout the calendar year, since mares regularly come into heat every 21 days, unless they are pregnant. The contracts therefore appear to contemplate breeding with Fleet Nasrullah at any time during the calendar year 1966. The trial court made no finding as to the time of performance called for by the contracts.[7] There was testimony to the effect that by custom in the thoroughbred racing business the breeding is consummated in a "breeding season" which normally extends from January until early July, although some breeding continues through August. It is possible that the parties intended that the mares be bred to Fleet Nasrullah during the 1966 breeding season rather than the calendar year 1966.[8]

However, in our view, it is immaterial whether the contract phrase "for the year 1966" is taken to mean the above breeding season or the

---

[7] The trial court was not compelled to specify the exact time for performance because it concluded that defendants had breached the contracts by anticipatory repudiation, i.e., a breach which occurs prior to the time for performance.

[8] Perhaps the fact that the stud fees were due to be paid September 1, 1966, at the close of the breeding season supports such a conclusion. Moreover, defendants concede without argument that the trial court impliedly found the time of performance to be the breeding season.

full calendar year since in either event the contract period had not expired by June 7 and June 14, 1966, the dates on which Sunday Slippers and Sandy Fork respectively were bred to Chateaugay[9] and by which time, according to the findings (see fn. 5, *ante*) defendants had repudiated the contracts. ■ There can be no *actual* breach of a contract until the time specified therein for performance has arrived. (*Gold Min. & Water Co.* v. *Swinerton* (1943) 23 Cal.2d 19, 29. [142 P.2d 22]; 1 Witkin, Summary of Cal. Law (8th ed.) § 629, p. 536; see Rest. 2d Contracts (Tent. Draft No. 8, 1973) § 260.) ■ Although there may be a *breach by anticipatory repudiation*: "[b]y its very name an essential element of a true anticipatory breach of a contract is that the repudiation by the promisor occur before his performance is due under the contract." (*Gold Min. & Water Co.* v. *Swinerton, supra,* 23 Cal.2d at p. 29.) ■ In the instant case, because under either of the above interpretations the time for performance had not yet arrived, defendants' breach as found by the trial court was of necessity an anticipatory breach and must be analyzed in accordance with the principles governing such type of breach. To these principles we now direct our attention.

■ Anticipatory breach occurs when one of the parties to a bilateral contract repudiates the contract. The repudiation may be express or implied. An express repudiation is a clear, positive, unequivocal refusal to perform (*Guerrieri* v. *Severini* (1958) 51 Cal.2d 12, 18 [330 P.2d 635]; *Gold Min. & Water Co.* v. *Swinerton, supra,* 23 Cal.2d 19, 29; *Whitney Inv. Co.* v. *Westview Dev. Co.* (1969) 273 Cal.App.2d 594, 602-603 [78 Cal.Rptr. 302]; *Atkinson* v. *District Bond Co.* (1935) 5 Cal.App.2d 738, 743-744 [43 P.2d 867]); an implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible (*Zogarts* v. *Smith* (1948) 86 Cal.App.2d 165 [194 P.2d 143]; 1 Witkin, Summary of Cal. Law (8th ed.) § 632, pp. 538-539; 4 Corbin, Contracts (1951) § 984, pp. 949-951).

■ When a promisor repudiates a contract, the injured party faces an election of remedies: he can treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or he can treat the repudiation as an empty threat, wait until the time for performance arrives and exercise his remedies for actual breach if a breach does in fact occur at such time. (*Guerrieri* v. *Severini, supra,* 51 Cal.2d 12, 18-19.) However, if the injured party disregards the repudiation and treats the

---

[9]Both Sunday Slippers and Sandy Fork would have had at least one more heat during the 1966 breeding season—that of Sunday Slippers commencing on June 26, 1966, and that of Sandy Fork commencing on July 7, 1966.

contract as still in force, and the repudiation is retracted prior to the time of performance, then the repudiation is nullified and the injured party is left with his remedies, if any, invocable at the time of performance. (*Id.,* at pp. 19-20; *Salot* v. *Wershow* (1958) 157 Cal.App.2d 352, 357-358 [320 P.2d 926]; see *Cook* v. *Nordstrand* (1948) 83 Cal.App.2d 188, 194-195 [188 P.2d 282]; *Atkinson* v. *District Bond Co., supra,* 5 Cal. App.2d 738, 743-744.

As we have pointed out, the trial court found that the whole course of conduct of defendants and their agents Dr. Pessin and Mrs. Judy from the time of the sale of Fleet Nasrullah up to and including June 13, 1966, amounted to a repudiation which plaintiff was justified in treating as an anticipatory breach. (See fn. 5, *ante.*) However, when the principles of law governing repudiation just described are applied to the facts constituting this course of conduct as found by the trial court, it is manifest that such conduct cannot be treated as an undifferentiated continuum amounting to a single repudiation but must be divided into two separate repudiations.

First, defendants clearly repudiated the contracts when, after selling Fleet Nasrullah and shipping him to Kentucky, they informed plaintiff "[y]ou are, therefore, released from your reservations made to the stallion." However, the trial court additionally found that "[p]laintiff did not wish to be 'released' from his 'reservations' . . . insist[ed] on performance of the stud service agreements . . . [and] threaten[ed] litigation if the contracts were not honored by defendants . . . ." Accordingly defendants arranged for performance of the contracts by making Fleet Nasrullah available for stud service to plaintiff in Kentucky through their agents Dr. Pessin and Mrs. Judy. Plaintiff elected to treat the contracts as in force and shipped the mares to Kentucky to effect the desired performance. The foregoing facts lead us to conclude that the subsequent arrangements by defendants to make Fleet Nasrullah available to service plaintiff's mares in Kentucky constituted a retraction of the repudiation. Since at this time plaintiff had not elected to treat the repudiation as an anticipatory breach[10] and in fact had shipped the mares to Kentucky in reliance on defendants' arrangements, this retraction nullified the repudiation. Thus, plaintiff was then left with his remedies that might arise at the time of performance.

The trial court found that after the mares had arrived in Kentucky, had delivered the foals they were then carrying and were ready for

---

[10]Plaintiff concedes that the repudiation was not "accepted by plaintiff."

servicing by Fleet Nasrullah, plaintiff was justified in concluding from the conduct of defendants, their agent Dr. Pessin, and their subagent Mrs. Judy, that "defendants were just giving him the runaround and had no intention of performing their contract in the manner required by its terms" and in treating such conduct "as a breach and repudiation of their contractual obligation to him." (See fn. 5, *ante.*) Since, as we have explained, defendants retracted their original repudiation, this subsequent conduct amounts to a finding of a second repudiation.

There is no evidence in the record that defendants or their agents Dr. Pessin and Mrs. Judy ever stated that Sunday Slippers and Sandy Fork would not be serviced by Fleet Nasrullah during the 1966 breeding season or that they ever refused to perform. Frazier, plaintiff's agent who made arrangements for the breeding of the mares admitted that they had never made such a statement to him.[11] Accordingly, there was no *express* repudiation or unequivocal refusal to perform. (*Guerrieri* v. *Severini, supra,* 51 Cal.2d 12, 18; *Atkinson* v. *District Bond Co., supra,* 5 Cal.App.2d 738, 743-744.)

The trial court's finding of repudiation, expressly based on the "conduct of the defendants" and their agents suggests that the court found an implied repudiation. However, there is no implied repudiation, i.e., by conduct equivalent to unequivocal refusal to perform, unless "the promisor *puts it out of his power to perform.*" (*Zogarts* v. *Smith, supra,* 86 Cal.App.2d 165, 172-173; 1 Witkin, Summary of Cal. Law (8th ed.) § 632, p. 538; 4 Corbin, Contracts, *supra,* § 984, pp. 949-951; Rest. 2d Contracts (Tent. Draft No. 8, 1973) §§ 268, 274.) Once the mares arrived in Kentucky, defendants had the power to perform the contracts; Fleet Nasrullah could breed with the mares. No subsequent conduct occurred to render this performance impossible. Although plaintiff was subordinated to the shareholders with respect to the priority of reserving a breeding time with Fleet Nasrullah, there is no evidence in the record that this subordination of reservation rights rendered performance impossible. Rather it acted to postpone the time of performance, which still remained within the limits prescribed by the contracts. It rendered performance more difficult to achieve; it may even have cast doubt upon the eventual accomplishment of performance; it did not render performance impossible.[12]

---

[11]"Q. . . . At any time, did Mrs. Judy or anyone else ever tell you that she could not or would not breed either mare to Fleet Nasrullah before the end of 1966? . . .

"THE WITNESS: No."

[12]Plaintiff suggests that this conduct, namely delaying plaintiff's breeding until a day not reserved by a shareholder, amounted to an anticipatory breach because Mrs. Judy

Because there was no repudiation, express or implied, there was no anticipatory breach. Plaintiff contends that defendants' conduct, as found by the trial court, indicated that "defendants were just giving him the runaround and had no intention of performing their contract" and therefore that this conduct was the equivalent of an express and unequivocal refusal to perform. Plaintiff has not presented to the court any authority in California in support of his proposition that conduct which has not met the test for an implied repudiation, i.e. conduct which removed the power to perform, may nonetheless be held to amount to the equivalent of an express repudiation and thus constitute an anticipatory breach. Without addressing ourselves to the question whether some conduct could ever be found equal to an express repudiation, we hold that defendants' conduct in this case as a matter of law did not constitute an anticipatory breach.

To constitute an express repudiation, the promisor's statement, or in this case conduct, must amount to an unequivocal refusal to perform: "A mere declaration, however, of a party of an intention not to be bound will not of itself amount to a breach, so as to create an effectual renunciation of the contract; for one party cannot by any act or declaration destroy the binding force and efficacy of the contract. To justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract . . . and must be distinct, unequivocal and absolute." (*Atkinson v. District Bond Co.,* *supra,* 5 Cal.App.2d 738, 743.)

To recapitulate, Sandy Fork was in foal in January 1966, the commencement of the 1966 breeding season, and remained so until June 5, 1966. Throughout this period Fleet Nasrullah could not perform his services as contracted due solely to the conduct of plaintiff in breeding Sandy Fork in 1965. Biologically the first opportunity to breed Sandy Fork was on June 14, 1966, nine days after foaling. Frazier telephoned Mrs. Judy on June 6, 1966, and received a booking with Fleet Nasrullah

---

inserted a condition to defendants' performance, which as the trial court found was not contemplated by the contracts. Assuming arguendo that this conduct might have amounted to a breach of contract by improperly delaying performance, at most it would have constituted only a partial breach—insufficiently material to terminate the contracts (see Rest. 2d Contracts (Tent. Draft No. 8, 1973) §§ 262, 266, 268, 274). It did not constitute a repudiation of the contracts which was the sole basis of the trial court's decision since "[t]o justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration . . . ." (*Atkinson v. District Bond Co., supra,* 5 Cal.App.2d 738, 743.)

for June 14, 1966. On June 13 Mrs. Judy telephoned Frazier and informed him she would have to cancel Sandy Fork's reservation for the following day because one of the shareholders insisted on using that day. Mrs. Judy gave no indication whatsoever that she could not or would not breed Sandy Fork on any of the following days in that heat period or subsequent heat periods. Frazier made no further attempts to breed Sandy Fork with Fleet Nasrullah. Thus, plaintiff, who delayed the possibility of performance for five months, asserts that the delay of performance occasioned by defendants' cancellation of a reservation on the first day during the six-month period that plaintiff made performance possible amounts to an unequivocal refusal to perform, even though there was adequate opportunity for Fleet Nasrullah to perform within the period for performance specified in the contract and even though defendants never stated any intention not to perform. We conclude that as a matter of law this conduct did not amount to an unequivocal refusal to perform and therefore did not constitute an anticipatory breach of the contract covering Sandy Fork.

Sunday Slippers foaled on April 17, 1966, first came into heat on April 26 and then successively on May 13 and June 4, 1966. Mrs. Judy informed Frazier that she would breed Sunday Slippers on any day that one of the shareholders did not want to use the stallion. Frazier unsuccessfully sought to breed the mare on April 26, May 14, May 15 and June 4, 1966, Fleet Nasrullah being reserved on those dates. Mrs. Judy continued to assure Frazier that the breeding would occur. Sunday Slippers was due to come into heat again twice during the breeding season: June 25 and July 16, 1966. At most this conduct amounts to delay of performance and a warning that performance might altogether be precluded if a shareholder were to desire Fleet Nasrullah's services on all the remaining days within the period specified for performance in which Sunday Slippers was in heat. We conclude that as a matter of law this conduct did not amount to an unequivocal refusal to perform and therefore did not constitute an anticipatory breach of the contract covering Sunday Slippers.

In sum, we hold that there is no evidence in the record supportive of the trial court's finding and conclusion that defendants repudiated and therefore committed an anticipatory breach of the contracts.

In view of the foregoing conclusion we need not consider defendants' remaining contentions.

The judgment is reversed.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Clark, J., and Richardson, J., concurred.

Respondent's petition for a rehearing was denied October 23, 1975, and the opinion was modified to read as printed above.