**Ray H. OLYAIE, Plaintiff–Appellant,**

v.

**GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION, Defendant–Appellee.**

No. 04–16392.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 19, 2006.

Filed Jan. 9, 2007.

John L. Flegel, Menlo Park, CA, for Plaintiff–Appellant.

Tomio B. Narita, Esq., Wineberg Simmonds & Narita, LLP, San Francisco, CA, for Defendant–Appellee.

Before: B. FLETCHER, KOZINSKI and FISHER, Circuit Judges.

## MEMORANDUM *

Ray H. Olyaie was one of a number of operators of Valero service stations who were offered the opportunity to purchase their respective stations. Olyaie signed a Purchase and Sale Agreement with Valero with respect to his service station in January 2001. After several extensions of the closing date, the closing of the sale and purchase of Olyaie's service station was set for Monday, April 30, 2001.[1]

---

* This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36–3.

1. Although we recognize that there is some evidence in the record that the closing date for the sale and purchase agreement had been further extended to May 31, 2001, other evidence in the record tends to show that neither Olyaie nor his contact at Valero was aware of that extension. Therefore, because we are reviewing an appeal from summary judgment where the "defendant ... has produced enough evidence to require the plaintiff to go beyond his ... pleadings" and "the plaintiff [has] counter[ed] by producing evidence of his ... own," *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir.2004), we "[v]iew[] the evidence in the light most

Olyaie sought the necessary financing for his purchase from General Electric Capital Business Asset Funding Corporation ("GE Capital"). On March 19, 2001, GE Capital and Olyaie executed a Conditional Loan Commitment Letter Agreement ("Letter"), whereby GE Capital agreed to lend Olyaie $700,000 subject to certain terms and conditions. In particular, GE Capital was concerned about environmental pollution at the service station site and required environmental insurance to cover this risk before it would lend to Olyaie. GE Capital scheduled the closing of the financing for Olyaie and other Valero service station purchasers for Tuesday, April 24. However, on the morning of the scheduled closing, Olyaie and others were told that the closing was cancelled without explanation save for a statement that the closing would be rescheduled.

In order to meet the April 30 closing deadline with Valero, Olyaie obtained financing from another lender, but at a considerably worse rate. Olyaie sued GE Capital for the resulting economic damages. The district court granted GE Capital's motion for summary judgment and dismissed Olyaie's suit. Olyaie filed a timely appeal. We affirm in part, reverse in part and remand.

## I.

Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ.Code § 1636 (2006). "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." *Id.* § 1647. "The rule is well settled that in construing the terms of a contract the construction given it by the acts and conduct of the

parties with knowledge of its terms, and before any controversy has arisen as to its meaning, is admissible on the issue of the parties' intent." *S. Cal. Edison Co. v. Superior Court,* 37 Cal.App.4th 839, 851, 44 Cal.Rptr.2d 227 (1995). Further, "[t]he practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred and did not concur in them." *Id.* (quoting 3 Corbin on Contracts § 558 (1960)).

With that in mind, we turn to the terms of the Letter and the parties' conduct prior and subsequent to its signing. The Letter stated that Olyaie's "request for mortgage financing has been approved subject to the usual terms, conditions, and remedies contained in GE Capital's customary loan documents...." Those conditions included: (1) a "Valero/Exxon Indemnification & Remediation Agreement acceptable to GE Capital"; (2) an environmental due diligence inquiry, subsequent to which the service station site must be able to be covered under "GE Capital's environmental insurance policy"; and (3) insurance "in such amounts as GE Capital may from time to time require."

During negotiations before the Letter was signed, in a separate letter dated February 14, 2001, GE Capital expressed concern about "enter[ing] the chain of title on a contaminated gas station" such as the station Olyaie was purchasing. Accordingly, GE Capital proposed four alternate conditions, any one of which would sufficiently mitigate the environmental hazard liability it sought to avoid: (1) a no further action letter, (2) an acceptable indemnity from a major oil company, (3) escrowed funds for the exclusive purpose of financ-

favorable to the nonmoving party, ... and draw[ ] all reasonable inferences in favor of

that party...." *Galvin v. Hay,* 374 F.3d 739, 745 (9th Cir.2004).

ing a clean-up or (4) GE Capital's successfully obtaining from its own insurer, AIG Insurance, a secondary insurance policy for the contaminated service station site. It was GE's understanding that the secondary insurance policy it sought from AIG would "insure the location of the site [Olyaie was purchasing] from any contaminates, basically in lieu of the indemnity." [2]

At various times before April 24, 2001, Olyaie spoke with Carole Sullivan, a loan officer at GE Capital who was in charge of his loan application. In either late February or late March, Olyaie alleges that she told him: "You have already been approved and ready to go. The only thing: I need a copy of your insurance." Understanding this to be a request for a copy of his *existing* insurance policy, Olyaie asked his secretary to forward that policy to Sullivan. Olyaie also faxed an environmental questionnaire to Sullivan with a fax cover sheet dated April 10, 2001. Olyaie states that Sullivan accepted the insurance policy he provided and told him, "That's it. Was finished." "That's all I remember because I was so happy. I was in Las Vegas and she call me and says everything is finish, ready to go." Olyaie also asked Sullivan whether he could close early (i.e., before the April 30 closing date of the Sale and Purchase Agreement). Olyaie's counsel asked Sullivan in a deposition if her response to Olyaie's request was "no, that [Olyaie] was otherwise qualified, but he

couldn't close because Valero wouldn't let him, all the closings had to be simultaneous." She answered that that was her understanding. Sullivan did not tell Olyaie of any progress GE Capital was making in securing secondary insurance from AIG.

On Monday, April 23, Sullivan and another GE Capital employee, Andrew Tubb, knew that the AIG Insurance policy had not yet been resolved, but still did not communicate this to Olyaie. At least until April 24, GE Capital's policy was to move forward with the loans on the belief that the AIG Insurance policy issue would be resolved favorably by the end of April. Because Sullivan believed that "everything was going to be finalized in reference to the insurance by the end of the week [Friday, April 27]," she did not take action to prevent GE Capital's counsel or the title officers from traveling to California for the scheduled signing on April 24.

However, on the morning of Tuesday, April 24, GE Capital informed its counsel that there was to be no signing of financing documents that day and counsel consequently returned to Texas that night. GE Capital's counsel informed the escrow officer at the title company's office in California that the signing appointments were to be cancelled and that they would be rescheduled, but did not provide any other explanation or a date for rescheduling. The escrow officer called Olyaie and in-

**2.** GE Capital's proposed arrangement with AIG Insurance for a secondary insurance policy was not customary practice for GE Capital and was not expressly included in the terms of the Letter. The Letter contains an integration clause that purports to prevent modifications of the Letter except in writing and signed by both parties. GE Capital does not invoke this provision on appeal, and in any event, we note that under California law, parties to a contract " 'may, by their conduct, waive such a provision' where evidence shows that was their intent." *Biren v. Equal. Emergency Med. Group, Inc.*, 102 Cal.App.4th

125, 141, 125 Cal.Rptr.2d 325 (2002) (quoting *Frank T. Hickey, Inc. v. Los Angeles Jewish Cmty. Council*, 128 Cal.App.2d 676, 682–83, 276 P.2d 52 (1954)). Under the principles of contract interpretation enunciated in *Southern California Edison Company*, we conclude that it was the mutual understanding of both Olyaie and GE Capital that the secondary insurance policy GE Capital was seeking from AIG Insurance would satisfy all of Olyaie's environmental insurance obligations under the Letter, even in the absence of a written modification confirming that intention.

formed him that his appointment was cancelled.

Olyaie attempted to contact Sullivan and Tubb at GE Capital on the morning of April 24, but was unable to reach them in person. Olyaie left messages, but did not receive any return phone calls from GE Capital representatives. Olyaie called a representative of Valero to ask whether an extension of the Sale and Purchase Agreement April 30 closing date was possible, and was told either that no extension was possible or that an extension of only a few days was possible. Olyaie then sought alternative financing later that same day from a "hard money" lender at substantially less favorable rates than the proposed GE Capital loan rates.

Olyaie's counsel attempted to contact GE Capital's counsel on April 24, both by phone and by fax. The fax sought assurances from GE Capital's counsel that it still intended to close on the loan by April 30. Olyaie's counsel reached GE Capital's counsel by telephone on April 25, but did not receive any assurances that the loan would close on April 30. When GE Capital's counsel was told that if the loan would not close on April 30, then Olyaie would have to seek alternate financing, GE Capital's counsel stated that Olyaie "should do what he has to do." Olyaie's loan broker, C.J. Lynden, also attempted to contact Tubb on April 24, but was unable to reach him for several days. When she did reach him, he was unable to confirm when the loans would close. Olyaie closed with another lender on April 26. GE Capital did not attempt to reschedule the signing of the documents with Olyaie, and those loans with the other Valero dealers who were also purchasing service stations and using Lynden as a broker did not close until after April 30.

## II.

1. *Failure to Give Assurance.* Olyaie's first theory of liability is that GE Capital repudiated its obligations under the Letter by failing to give assurance of performance within a reasonable time after cancelling the April 24, 2001 signing of loan documents. *See* Restatement (Second) of Contracts § 251 (1981). Though section 251 of the Restatement is quoted verbatim in Witkin's treatise on California contract law, 1 Bernard E. Witkin et al., Sum. Cal. Law Contracts § 865 (10th ed. 2005), no California court appears to have explicitly adopted that section of the Restatement. *See In re Pac. Gas & Elec. Co.,* 271 B.R. 626, 643 n. 11 (N.D.Cal.2002) ("Neither California nor Washington courts have adopted Section 251 [of the Restatement of Contracts]."). We therefore conclude that Olyaie cannot raise any genuine issue of material fact that would lead to recovery under this theory of liability. *Cf. Kirkland v. Legion Ins. Co.,* 343 F.3d 1135, 1141 (9th Cir.2003) (declining to apply section 251 of the Second Restatement of Contracts when plaintiffs "have not cited, and we have not found, any Oregon court that has cited, or relied on, this section of the Restatement").

2. *Implied Repudiation.* Olyaie's second theory of liability is that GE Capital anticipatorily breached the Letter because the cancellation of the April 24 signing constituted an implied repudiation. "[A]n implied repudiation results from conduct where the promisor puts it out of his power to perform so as to make substantial performance of his promise impossible." *Taylor v. Johnston,* 15 Cal.3d 130, 123 Cal.Rptr. 641, 539 P.2d 425, 430 (1975) (citations omitted). "[P]ostpon[ing] the time of performance" may "render[ ] performance more difficult to achieve; it may even ... cast doubt upon the eventual accomplishment of performance; [but] it

[need] not render performance impossible." *Id.* at 432.

■ Even though the *Taylor* standard is stringent, we conclude that Olyaie has raised a genuine issue of material fact as to whether GE Capital's cancellation of the April 24 signing made it impossible for GE Capital to substantially perform pursuant to the Letter by April 30. It is true there remained six days after the cancellation to close the financing before April 30, but two of those days fell on a weekend. Further, GE Capital failed to communicate with Olyaie on April 24 despite his repeated attempts to contact Sullivan and Tubb, GE Capital recalled its counsel from California to Texas on April 24, and GE Capital's counsel advised that Olyaie "should do what he has to do" in light of the cancellation of the signing. Given the relative lack of alacrity with which GE Capital responded to Olyaie and its failures of communication, it may have been impossible for it to schedule another signing on or before April 30. Under these circumstances, we hold that there is genuine issue of material fact whether GE Capital put it out of its power to perform by April 30 when it cancelled the April 24 signing with Olyaie. We therefore remand to the district court for further proceedings, consistent with this disposition, concerning Olyaie's claim of an anticipatory breach of contract.

■ 3. *Actual Breach.* Olyaie's third theory of liability is that GE Capital actually breached the Letter by failing to close on April 30, 2001. However, "[t]he plaintiff must be free from substantial default in order to avail himself or herself of the remedies for the defendant's breach. Hence, the plaintiff must plead and prove performance or tender on his or her part or an excuse for performance." 1 Witkin, Sum. Cal. Law Contracts § 848. In a deposition, Olyaie's conceded that "[o]n [April] 24, when I saw the situation what is going on, I gave up on GE, and everything

GE says I don't believe it"; "[a]fter that day I would not trust GE Capital." When asked by GE Capital's counsel whether he "want[ed] to see the GE loan work out," he responded "[n]ot after [April] 24." Therefore, Olyaie cannot prove that he was ready to tender his own performance through April 30 as required by the Letter—and consequently has failed to create an issue of material fact as to his eligibility to collect under a breach of contract theory.

■ 4. *Breach of Covenant of Good Faith and Fair Dealing.* Olyaie's last argument is that GE Capital's cancellation of the signing without any explanation merely six days before the closing with Valero violated the covenant of good faith and fair dealing implied in the Letter. We agree that Olyaie has raised material issues of fact with respect to this theory of liability and that it was not appropriate to resolve it on a summary judgment motion.

The covenant of good faith and fair dealing is "implied by law in every contract," *Guz v. Bechtel Nat'l, Inc.,* 24 Cal.4th 317, 100 Cal.Rptr.2d 352, 8 P.3d 1089, 1110 (2000), including "the contractual relationship between a borrower and lender." *Wagner v. Benson,* 101 Cal.App.3d 27, 33, 161 Cal.Rptr. 516 (1980). The covenant obligates the parties to a contract not to "do anything which injures the right of the other to receive the benefits of the agreement." *Id.*

> Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the

spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*R.J. Kuhl Corp. v. Sullivan,* 13 Cal. App.4th 1589, 1602, 17 Cal.Rptr.2d 425 (1993) (quoting Restatement (Second) of Contracts § 205, cmt. d (1981)).

The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another. Such power must be exercised in good faith. However, defining what is required by this covenant has not always proven an easy task.... Notwithstanding the difficulty in devising a rule of all-encompassing generality, a few principles have emerged in the decisions. To begin with, breach of a specific provision of the contract is not a necessary prerequisite.... Nor is it necessary that the party's conduct be dishonest. Dishonesty presupposes subjective immorality; the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive.

*Carma Developers (Cal.), Inc., v. Marathon Dev. Cal., Inc.,* 2 Cal.4th 342, 6 Cal. Rptr.2d 467, 826 P.2d 710, 726–27 (1992) (internal citations and quotation marks omitted).

Drawing all appropriate inferences in favor of Olyaie, *see supra* note 1, we conclude that there is a genuine issue of material fact whether GE Capital's conduct was objectively unreasonable. GE Capital's February 14, 2001 letter shows that GE Capital undertook an independent course of action—seeking an AIG Insurance policy for Olyaie and other buyers of contaminated service stations—that was out of Olyaie's control but consistent with the purpose of the contract. Such a secondary insurance policy would have satisfied GE Capital's concerns regarding the liability they would face as the titleholder of a contaminated station in the event of loan default. But in addition to limiting its liability, GE Capital was concerned with "keeping the costs [of the secondary policies] at a reasonable level...."

It was this concern with the cost of the policies being offered by AIG—approximately $45,000 per site rather than the $2,000 that had been the price of coverage for noncontaminated sites—that led GE Capital to cancel the April 24 signing. However, GE Capital did not disclose to Olyaie the difficulties it was having in its price negotiations with AIG. Nor did it offer to pass along the $45,000 insurance cost to Olyaie—an offer that Olyaie declares he would have accepted in order to close the loan with GE Capital by April 30. Instead, GE Capital scheduled the signing on April 24 and communicated with Olyaie in such a manner as to lead an objectively reasonable observer to conclude that there were no difficulties with the course of action GE Capital had proposed that it would undertake in its February 14 letter.

We hold that there is a genuine issue of material fact whether GE Capital acted in an objectively unreasonable manner by misleading Olyaie or lulling him into a mistaken belief that the environmental insurance condition either was or would be resolved favorably in time to close the loan by April 30. Secondly, even if GE Capital had clearly communicated that the insurance issue was still unresolved at the time of the scheduled signing on April 24, we hold that there is a genuine issue of material fact whether GE Capital acted in an objectively unreasonable manner in declining AIG's offer of insurance, thereby frustrating the closing of the loan on April 30, without at least apprising Olyaie of the situation and giving him the opportunity to

assume the extra cost of this insurance. As the dissent points out, Olyaie was originally responsible for providing environmental insurance pursuant to the Letter. But there is a material issue of fact whether GE Capital undertook to relieve Olyaie of that obligation and then unreasonably kept him in the dark or misled him about the progress of negotiations with AIG. We therefore remand to the district court for further proceedings, consistent with this disposition, concerning Olyaie's claim of a breach of the implied covenant of good faith and fair dealing.

AFFIRMED in part, REVERSED in part, REMANDED.

KOZINSKI, Circuit Judge, dissenting:

GE Capital agreed to finance Olyaie's purchase of a gas station if he met certain conditions designed to minimize GE Capital's liability for contaminated gas tanks at the site. The key condition relevant to this case required Olyaie to obtain an indemnification agreement from Valero/Exxon that was acceptable to GE Capital. In a February 14, 2001, letter predating the signing of the actual loan agreement, GE Capital indicated that it might be willing to waive this condition, should Olyaie obtain a supplemental pollution liability policy from AIG, and it subsequently acted as a liaison between Olyaie and AIG. But at no point did GE Capital indicate that it was willing to waive the indemnity provision—unless Olyaie obtained an AIG pollution liability policy.

The parties do not dispute whether Olyaie had obtained either an acceptable indemnification agreement or a supplemental AIG policy by the scheduled closing date, April 24, 2001. He had not. Thus, the condition precedent to GE Capital's obligation to fund the purchase had not been met, and GE Capital had no obligation to close the loan on the scheduled date. For this reason, Olyaie has no

breach of contract claim. Nonetheless, the majority allows Olyaie to revive his contract claim under different names by holding that summary judgment was inappropriate on Olyaie's implied repudiation and bad faith claims.

The nub of Olyaie's implied repudiation claim is that GE Capital's cancellation of the April 24th closing made it "substantially impossible" to close the loan by April 30, 2001, the date on which both Olyaie's option to purchase the Valero station and GE Capital's loan commitment expired. It might have been difficult—perhaps even impossible—for Olyaie to meet these conditions in the six remaining days. But "an implied repudiation results from conduct where the promisor puts it out of *his* power to perform so as to make substantial performance of his promise impossible." *Taylor v. Johnston,* 15 Cal.3d 130, 123 Cal.Rptr. 641, 539 P.2d 425, 430 (1975) (emphasis added). The sole reason for the promisor's—GE Capital's—refusal to close the loan on April 24th was that Olyaie had not satisfied the environmental conditions. If Olyaie had satisfied the conditions before April 30th, there's nothing in the record to suggest GE Capital couldn't have closed on the loan. The logistics of getting all of the parties together for a second time may have been difficult, but, in an era of air travel, video conferencing, email, facsimiles and FedEx, there's no reason to believe it would have been *impossible*— which is the standard California courts apply in determining whether a contract has been impliedly repudiated. *Id.* Moreover, the loan agreement allowed Olyaie to ask for a sixty-day extension of the commitment from GE Capital—a provision plaintiff never invoked.

Assuming the facts in a light most favorable to plaintiff, GE Capital was somewhat unresponsive to Olyaie's follow-up inquiries after the closing was canceled. But

Olyaie never gave GE Capital any indication that he had satisfied the environmental conditions or was taking the steps necessary to do so in advance of the April 30th deadline. And, until he did so, there was no reason to talk. Olyaie's lawyer did have a conversation with GE Capital's counsel in which he threatened that his client was on the verge of taking his business elsewhere. The majority sees GE Capital's counsel's response—that Olyaie should do "what he has to do"—as an indication that GE Capital was no longer willing to fund the loan. This overlooks the fact that it was Olyaie's failure to satisfy the conditions, not GE Capital's recalcitrance, that was holding up the closing at this point. Given that the loan commitment was quickly approaching and Olyaie had yet to satisfy the environmental conditions, there was little reason for GE Capital to be optimistic. Thus, GE Capital's counsel's statement was a realistic assessment of what Olyaie would be able to do—not an indication of GE Capital's unwillingness to perform.

Finally, the majority holds that Olyaie has alleged an act of bad faith on GE Capital's part for misrepresenting the status of Olyaie's insurance policy with AIG. The only evidence Olyaie relies on to support this claim are Carole Sullivan's statements in early April that he was "qualified" for the loan and that everything was "final." But these statements merely confirmed what GE Capital had communicated in March—that it had agreed to fund Olyaie's purchase of the gas station, *subject to his meeting the environmental conditions*. GE Capital gave periodic updates to Olyaie's loan agent, C.J. Lynden, throughout March and April on the status of the AIG negotiations, and apprised her of the difficulties it was having in obtaining affordable supplemental policies for the station purchasers. And this knowledge is imputed to Olyaie. *In re Marriage of Cloney,* 91 Cal.App.4th 429, 110 Cal.

Rptr.2d 615, 623 (2001). Moreover, Olyaie himself faxed an insurance questionnaire to AIG on April 10th. So, as of that date, a mere two weeks before the scheduled closing, he knew with certainty that he wasn't covered. He received no subsequent confirmation that his application had been accepted, nor did he cut a check for the premium.

Thus, as of April 24, 2001, Olyaie had, on one hand, a vague assurance from Sullivan, communicating nothing more than was in the March commitment letter, and, on the other, knowledge that GE Capital's negotiations with AIG were not going well and that he had heard nothing from AIG, two weeks after faxing in his questionnaire. If Olyaie relied on Sullivan's statements rather than the weight of the evidence available to him, that was his mistake, not GE Capital's.

GE Capital's abrupt cancellation of the closing was not a model of professional courtesy. But it didn't "destroy[ ] or injur[e] the right of [Olyaie] to receive the fruits of the contract." *Storek & Storek, Inc., v. Citicorp Real Estate, Inc.,* 100 Cal.App.4th 44, 122 Cal.Rptr.2d 267, 276 (2002). The fruits would have been there for Olyaie to enjoy, if he had satisfied the environmental conditions. GE Capital's efforts to help him satisfy those conditions in no way extended the scope of the company's contractual obligations to Olyaie. To the extent he believed otherwise, he was mistaken, and the company had no obligation to clarify matters for him.