Filed 9/5/25  Filio v. Wilmington Savings Fund Society CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| ANA LIZA FILIO,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>WILMINGTON SAVINGS FUND SOCIETY, FSB, dba CHRISTIANA TRUST AS TRUSTEE FOR PNPMS TRUST,<br><br>　　　Defendant and Appellant. | B340604<br><br>(Los Angeles County Super. Ct. No. 19STCV38851) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Theresa M. Traber, Judge.  Affirmed.

Wright, Finlay & Zak, Jonathan D. Fink and Kristina M. Pelletier for Defendant and Appellant.

The Law Office of Yossi Noudel and Yossi Noudel for Plaintiff and Respondent.

\* \* \* \* \* \*

In this lawsuit by a borrower for declaratory relief entitling the borrower to repay her lender less than the original amount of an outstanding loan pursuant to the terms of a repayment agreement between them, the trial court granted summary judgment for the borrower. The lender appeals. We conclude there was no error, and affirm.

## FACTS AND PROCEDURAL BACKGROUND

I.  **Facts**[1]

A.  *Creation of the "junior loan"*

In June 2006, Ana Filio (plaintiff) and Bassanio Martinez bought a home on West 190th Street in Torrance, California for $850,000. They financed the purchase with two loans from WMC Mortgage Corp. (WMC Mortgage)—a first loan for $679,920 and a second loan for $169,980 (the junior loan); each loan was secured by a deed of trust on the property.

Plaintiff and Martinez defaulted on the junior loan in January 2009.

B.  *Entry into a repayment agreement*

By May 2018, Martinez had quitclaimed all interest in the property to plaintiff, WMC Mortgage had sold the junior loan to Anson Street, LLC (Anson Street), and Anson Street had retained

---

1  We draw these facts either from the parties' stipulated facts or from facts otherwise undisputed in the record.

2

Shellpoint Mortgage Servicing (Shellpoint) to service the junior loan.

On May 2, 2018, plaintiff called Shellpoint to discuss how to deal with the junior loan, on which plaintiff had not made a payment since 2009.  On that call, Shellpoint agreed to accept, in satisfaction of the junior loan, a vastly reduced amount of $33,738.92 (rather than the $168,077.69 loan principal plus interest), and to allow plaintiff to pay that amount with a $10,000 "down payment" and "monthly installments" of $659.41 for "36 months" as long as plaintiff did not "miss any payments."

On May 30, 2018, Shellpoint sent plaintiff a letter it drafted that detailed this new repayment arrangement and settlement, and which had Anson Street's approval (the repayment agreement).  Specifically, the repayment agreement provides in pertinent part that (1) "Shellpoint is to receive proceeds in an amount not less than $33,738.92 on or before [April 15, 2021]," at which point "the [junior loan] debt will be considered to be fully satisfied for less than the amount due"; (2) this amount was to be paid in "36 Payment(s) of $659.41 [which] includes Release fee of $36.00, with 1st installment of 10,000 on 5/15/2018 totaling $33,738.92 due by 4/15/21";[2] and (3) the "agreement is VOID if a payment is missed or if a payment is returned for insufficient funds (NSF)."

---

[2]     The repayment agreement is sloppily drafted because its payment schedule does *not* result in a payment of $33,738.92 by April 15, 2021.  If the first installment of $10,000 is paid on May 15, 2018, and the remaining payments of $659.41 are to be paid once a month thereafter, only $33,079.35 will be paid by April 15, 2021.  Furthermore, an additional payment of $659.41 will still leave a balance of $0.16 owed.

3

On May 15, 2018, plaintiff made the initial payment of $10,000.

In three separate agreements, plaintiff authorized Shellpoint to automatically withdraw $659.41 from her bank account on the 15th of the month from June 2018 through July 2019. Shellpoint did so from June 2018 through March 2019.

## C. *The junior loan is acquired and moved to a new loan servicer*

On March 29, 2019, Anson Street transferred the junior loan to Wilmington Savings Fund Society (Wilmington), and Shellpoint transferred its loan servicing duties on the junior loan to Statebridge Company, LLC (Statebridge).[3] As part of the transfer of loan servicing, Shellpoint sent plaintiff a letter on March 12, 2019, and Statebridge sent plaintiff a letter on April 8, 2019; Statebridge's letter stated that "[a]ny payments received by [Shellpoint] after March 28, 2019 will be forwarded to Statebridge" and both letters stated that "a loan payment received by" Shellpoint "[d]uring the 60 day period following the effective date of the transfer of the loan servicing" "may not be treated" "as late" by Statebridge.

## D. *Neither loan servicer automatically withdraws plaintiff's monthly payment on April 15, 2019, and Statebridge declares plaintiff in default on May 7, 2019*

Although plaintiff authorized the automatic withdrawal of the April 15, 2019 payment, neither Shellpoint nor Statebridge withdrew that payment from her account on that date. Instead, on May 7, 2019, Statebridge sent plaintiff a letter declaring that

---

[3] The transfer of the loan was not recorded until July 5, 2019.

4

she was in "default" for not paying the May 1, 2019 payment,[4] and "the total amount due" was $200,171.30 (the junior loan principal and interest as of that date). When plaintiff contacted Statebridge on June 5, 2019, Statebridge indicated it was unaware of the repayment agreement (which explains why the May 7 letter made no reference to it or to a due date on the 15th of the month) and asked plaintiff to fax it to them.

On June 21, 2019, Statebridge sent plaintiff a letter informing her of its position that the repayment agreement was void because Statebridge "did not timely receive [plaintiff's] settlement agreement payment due 4/15/2019."[5]

E. ***Statebridge's subsequent acceptance of plaintiff's payments for April, May and June 2019***

On July 3, 2019, plaintiff sent a check to Statebridge for $2,637.64, which reflected the monthly payments for April 15, May 15, June 15, and July 15, 2019 (that is, four times $659.41) that neither Shellpoint nor Statebridge had withdrawn from plaintiff's account despite her authorization for those withdrawals.

On July 9, 2019, Statebridge cashed plaintiff's check.

---

[4] Statebridge's letter states that the payment was due "May 1, *2009*," but this appears to have been a typo given the sequence of events.

[5] Statebridge later submitted a declaration that it had "determined the Repayment Agreement" had been invalidated due to not "receiv[ing] any payments from [plaintiff] for the months of April, May or June 2019." However, because the contemporaneous basis for Statebridge's determination was solely its failure to receive the April 15, 2019 payment, Statebridge cannot subsequently and retroactively alter the basis for its invalidation of the repayment agreement.

**F.** *Statebridge initiates foreclosure proceedings*

On July 9, 2019, Statebridge filed a notice of default on the deed of trust on the junior loan, seeking immediate payment of $204,070.70.

On October 15, 2019, Statebridge filed a notice of trustee's sale of the property, setting the sale date for November 5, 2019.

On November 15, 2019, Statebridge sent plaintiff a check for $2,637.64, reflecting the amount Statebridge had accepted from plaintiff back in July 2019. Plaintiff did not cash that check.

## II. Procedural Background

### A. *Pleadings*

On October 28, 2019 (which was before the date of the November 5, 2019 trustee's sale of the property and before Statebridge tried to undo its acceptance of plaintiff's July 2019 check), plaintiff sued Wilmington, Anson Street, Statebridge, Shellpoint and others on ten causes of action.

The trial court granted plaintiff's motion to preliminarily enjoin the November 5, 2019 sale.

After the trial court sustained demurrers to plaintiff's original complaint, her first amended complaint, and her second amended complaint, plaintiff on November 9, 2020 filed the operative third amended complaint, which contained eight causes of action. Among those causes of action was a claim for declaratory relief, which sought declarations that (1) Wilmington had "hindered and otherwise circumvented the [repayment] [a]greement [in order to] cause an alleged default thereof", and (2) plaintiff was "not in default of the terms of the [junior loan's promissory n]ote, as amended by the [repayment] [a]greement", which calls upon the trial court to "interpret[]" that agreement.

6

**B.** *Stipulation to narrow issues and submit cross-motions for summary judgment*

On December 8, 2023, plaintiff and Wilmington entered into a stipulation. Pursuant to that stipulation, plaintiff agreed to dismiss Statebridge, to dismiss all claims except her declaratory relief claim, and to narrow the declaratory relief claim to the "sole issue" of "what amounts, if any, are owed to Wilmington on the [junior loan]." Plaintiff and Wilmington also "anticipate[d]" filing cross-motions for summary judgment.

**C.** *Cross-motions for summary judgment*

Plaintiff and Wilmington filed cross-motions for summary judgment on plaintiff's sole remaining claim for declaratory relief.[6] After a hearing on June 20, 2024, the trial court issued a 19-page ruling granting plaintiff's motion and denying Wilmington's. Specifically, the court ruled that plaintiff had not breached the repayment agreement because that agreement had no "particular repayment schedule" for the 36 "installment" payments, such that plaintiff "did not breach the [a]greement in April 2019 or thereafter," thereby rendering Wilmington's "refusal to accept payment in July 2019" "improper." Thus, the court reasoned, plaintiff "owes only the outstanding balance" on the repayment agreement, which came to $14,507.18.

**D.** *Judgment and appeal*

After the trial court entered judgment for plaintiff, Wilmington timely filed this appeal.

---

[6] In conjunction with these motions, the parties also filed evidentiary objections. The trial court either overruled them or sustained them as to evidence that does not implicate our analysis in this opinion.

7

**DISCUSSION**

Wilmington argues that the trial court erred in granting summary judgment in plaintiff's favor and not in its favor. A moving party is entitled to summary judgment if it can "show that there is no triable issue as to any material fact" and that it "is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) We review de novo a grant or denial of summary judgment (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286); we may accordingly "'affirm'" a trial court's summary judgment order "'if it is correct on any ground that the parties had an adequate opportunity to address in the trial court, regardless of the trial court's stated reasons'" (*Montague v. AMN Healthcare, Inc.* (2014) 223 Cal.App.4th 1515, 1520). As narrowed by the parties, the question on appeal is whether the undisputed facts show that plaintiff defaulted on her payment obligations under the repayment agreement: If she defaulted, then the agreement is invalidated and she owes the full amount of the junior loan; if she did not default, then the agreement remains valid and she only owes the balance still due under that agreement.

**I. Analysis**

We conclude that the undisputed facts establish that plaintiff did *not* default on her obligations under the repayment agreement for two reasons.

**A.** *Statebridge anticipatorily breached the repayment agreement and plaintiff nevertheless elected to enforce the agreement*

In its May 7, 2019 and June 21, 2019 letters, Statebridge first stated and then clarified, respectively, that it considered plaintiff in default of the repayment agreement and deemed that

8

agreement to be invalid because Statebridge had "not timely received" plaintiff's April 15, 2019 payment. In other words, Statebridge renounced the repayment agreement because plaintiff's payment due on April 15, 2019 was late. This was improper. The parties stipulated that the junior loan is a "federally related mortgage loan." As such, "[d]uring the 60-day period beginning on the effective date of transfer of the servicing" of that loan—which is defined as "the date on which the mortgage payment of a borrower is first due" to the new servicer—"no . . . payment" "on such loan" "may be treated as late . . . if the payment is received by the" prior servicer "before the due date applicable to such payment." (12 U.S.C. § 2605(d) & (i)(1).) In other words, Statebridge could not treat any payment by plaintiff as late until 60 days after April 15, 2019—that is, until June 14, 2019. Yet that is precisely what Statebridge did. Because Statebridge's letters communicated a "clear, positive, unequivocal refusal to perform" the repayment agreement that was unjustified, Statebridge's May 7, 2019 letter effected an express repudiation of that agreement. (*Taylor v. Johnston* (1975) 15 Cal.3d 130, 137.) Where, as here, a party "repudiates a contract," the other party "faces an election of remedies"—namely, (1) "[s]he can treat the repudiation as an anticipatory breach and immediately seek damages" *or* (2) "[s]he can treat the repudiation as an empty threat" and continue to treat the agreement as valid. (*Ibid.*) Plaintiff elected the latter remedy by never withdrawing authorization for automatic withdrawals, by sending Statebridge a check in July 2019 for the April, May, June and July payments, by sending Statebridge checks for every month thereafter, and by offering to pay the outstanding balance under the agreement. Because the undisputed facts establish that it was *Wilmington*

9

(through its servicer, Statebridge) and not plaintiff who breached the repayment agreement, plaintiff retained the right to enforce that agreement.

Wilmington resists this conclusion with two arguments.

First, Wilmington argues that Shellpoint and Statebridge sent notices to plaintiff in March and April 2019, respectively, informing her that she would need to authorize Statebridge to conduct the automatic withdrawals. Even if we eliminate the factual dispute over whether plaintiff *received* these notices by resolving that dispute in Wilmington's favor and assuming that plaintiff did receive those notices, both notices paraphrased the federally mandated 60-day grace period and Statebridge's letter went one step further by saying that Shellpoint would "forward[]" to Statebridge any payments by plaintiff during this 60-day window.

Second, Wilmington argues that plaintiff is not entitled to the 60-day grace period under federal law because it only applies if the borrower's payment "is *received*" by the prior servicer during that period (12 U.S.C. § 2605(d), italics added), and Shellpoint never "received" plaintiff's April 15, 2019 payment because it chose not to make the automatic withdrawal plaintiff had authorized it to make. We reject this argument. Plaintiff made that April 15, 2019 payment available to Shellpoint by authorizing its withdrawal in advance; Shellpoint could have withdrawn that money and forwarded it to Statebridge (as Statebridge represented Shellpoint would), but Shellpoint elected not to do so. Shellpoint's conduct is analogous to refusing to cash a check plaintiff mailed to Shellpoint with her payment. Either way, it was *Shellpoint*'s conduct that prevented payment—not plaintiff's. In that situation, the debtor—here, plaintiff—"is

10

entitled to all the benefits which [s]he would have obtained" if Shellpoint had not prevented the payment from going through. (Civ. Code, § 1512 ["If the performance of an obligation be prevented by the creditor, the debtor is entitled to all the benefits which [s]he would have obtained if it had been performed by both parties"]; *Vineland Homes, Inc. v. Barish* (1956) 138 Cal.App.2d 747, 759 [same].) And even if we assume the word "received" is ambiguous, we would not construe that ambiguity to require the *debtor* to force one of the two servicers to process the payment it received because imposing that requirement would set up a loophole for servicers that seems wholly at odds with the purpose of the grace period in the first place—to give some leeway to debtors caught up in a transition between loan servicers. (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567 [in construing statutory ambiguities, courts should ""give the statute a reasonable construction conforming to [the Legislature's] intent,"" italics omitted but insertion in original].)

## B. *Plaintiff cured any default*

Even if we assume that plaintiff breached the repayment agreement by not making timely installment payments in April, May and June 2019, that breach was cured when plaintiff paid those amounts to Statebridge in July 2019 and when Statebridge accepted that payment. (*Bank of America v. La Jolla Group II* (2005) 129 Cal.App.4th 706, 711 ["'Speaking generally, the acceptance of payment of a delinquent installment of principal or interest cures that particular default and precludes a foreclosure sale based upon such preexisting delinquency . . .'"]; *Bisno v. Sax* (1959) 175 Cal.App.2d 714, 724-725 [same].) Neither Statebridge nor Wilmington could "un-cure" the default by trying to refund plaintiff's payments months later after litigation commenced.

11

## II. Further Arguments

Wilmington devotes most of its briefing on appeal to arguing that (1) the trial court erred in construing the repayment agreement as not requiring *monthly* installment payments and (2) there were material disputes of fact as to whether plaintiff ever received Shellpoint's and Statebridge's notices regarding the change in loan servicer. We need not address either argument because the rationale upon which we affirm is unaffected by how these two issues are resolved. Wilmington also responds to many of plaintiff's other arguments (regarding Wilmington's alleged unclean hands and its other affirmative defenses), but those issues are similarly irrelevant to the analysis upon which we rely to affirm.

## DISPOSITION

The judgment is affirmed. Plaintiff is entitled to her costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, P.J.

HOFFSTADT

We concur:

_____, J.

MOOR

_____, J.

KIM (D.)

12