Filed 12/14/20  Plotts Real Estate v. Reidy CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| PLOTTS REAL ESTATE, LP, et al., | D075672 |
| Plaintiff, Cross-defendants and Respondents, | |
| v. | (Super. Ct. No. 37-2015-00029139-CU-BC-CTL) |
| FRANCIS J. REIDY, et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants, Cross-complainants and Appellants. | NO CHANGE IN JUDGMENT |

THE COURT:

The opinion filed on November 25, 2020, is hereby modified as follows:

1.     On page 29, in the first line, add the following new footnote 14 immediately after the parenthesis at the end of the quote (" ' . . . contract.' ") and before the beginning of the case citation ("(*Neet v. Holmes . . .*") and renumber the remaining footnotes:

In a petition for rehearing, Appellants argue that Reidy could not have waived his right to rescind the Guaranty, because (1) he did not

learn of PRE's threats related to the availability of the two, five-year options until April 2014, and (2) the record lacks substantial evidence to support a finding that, after April 2014, Reidy accepted any benefits under the Guaranty that would support a waiver of his right to rescind the Guaranty. Reidy misunderstands the applicability of the doctrine of waiver. It applies *only to Bar West's* waiver of any potential right to rescind *the Lease*, not to Reidy's potential right to rescind the Guaranty. The trial court did not find, and our opinion does not suggest, that Reidy waived any right he may have had to rescind the Guaranty.

2.      On page 37, in current footnote 19 (renumbered fn. 20), delete the last sentence ("Here, Appellants . . .") and replace it with the following:

Here, in their briefing, Appellants do not discuss section 1717, subdivision (b)(2)'s pleading requirement; Appellants' answer to the first amended complaint does not allege section 1717, subdivision (b)(2)'s required tender; and by failing to provide copies of the pleadings in support of and in opposition to their November 2015 application to deposit funds, Appellants again have failed to overcome the presumption of correctness that attaches to the judgment (*Jameson*, *supra*, 5 Cal.5th at p. 609).
   In a petition for rehearing, Appellants argue that they could not allege in their answer a Civil Code section 1717, subdivision (b)(2) deposit because the trial court did not allow Bar West's attempt to make the deposit into court. Because Appellants misread the statute— which requires, *first*, the allegation of a tender in the defendant's answer, and *second*, the deposit of the tender into court (*ibid.*)— Appellants fail to establish reversible error. Very simply, Appellants' failure to have complied with a statutory pleading prerequisite for making a deposit into court supports the trial court's ruling.

3.      On page 37, after the second line (". . . prevailing party.") and before the new point heading ("D.  *Prejudgment Interest*"), insert the following paragraph of text:

In a petition for rehearing, Bar West argues that the trial court erred in not ruling that *Bar West* was the prevailing party *on the tort claims*. According to Bar West, because the jury awarded PRE nothing

on its two tort claims against Bar West, and the jury awarded Bar West $254,228.10 on its tort claim against PRE, Bar West was the prevailing party, and thus entitled to costs, on both parties' tort claims. Bar West presents no authority for its position. That is not surprising, since awards of costs are statutory (Code Civ. Proc., § 1021 et seq.); Code of Civil Procedure section 1032, subdivision (4), which defines "prevailing party," does not base determination of prevailing party status on a type of claim (i.e., tort vs. contract); and, as applicable here, the prevailing party is "the party with *a net monetary recovery*" (*ibid.*, italics added). "[W]here both plaintiff and cross-complainant recover money judgments, a defendant to whom the 'net result of the judgment' is favorable is entitled to recover all his costs." (*Gerstein v. Smirl* (1945) 70 Cal.App.2d 238, 240 [under Code Civ. Proc., former § 1032]; accord, *Linton v. Superior Court* (1997) 53 Cal.App.4th 1097, 1102 [under current Code Civ. Proc., § 1032, "the recipient of the net award will be considered the prevailing party for an award of costs"].) Here, the jury awarded PRE $486,483.67 against Bar West; the jury awarded Bar West $254,228.10 against PRE; and, based on the net verdict plus interest, the court entered a judgment in favor of PRE and against Bar West in the amount of $344,368.57. In sum, the results of the parties' respective tort claims are irrelevant to the determination of the prevailing party; Code of Civil Procedure section 1032, subdivision (4) requires consideration of only the "net monetary recovery" in the action.

There is no change in judgment.

Appellants' petition for rehearing is denied.

McCONNELL, P. J.

Copies to: All parties

3

Filed 11/25/20  Plotts Real Estate v. Reidy CA4/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| PLOTTS REAL ESTATE, LP, et al., | D075672 |
| Plaintiff, Cross-defendants and Respondents, | |
| v. | (Super. Ct. No. 37-2015-00029139-CU-BC-CTL) |
| FRANCIS J. REIDY, et al., | |
| Defendants, Cross-complainants and Appellants. | |

APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge.  Affirmed.

Smaha Law Group, John L. Smaha and Kristen Marquis Fritz for Defendants, Cross-complainants and Appellants.

Walsh McKean Furcolo LLP, Christopher M. Lea; Law Offices of David B. Norris and David B. Norris for Plaintiff, Cross-defendants and Respondents.

In this appeal, we review a judgment following a trial at which the jury answered questions on special verdict forms and the court issued a statement of decision on an equitable (nonjury) claim. The underlying dispute involves the lease for a bar and restaurant formerly located at 959 Hornblend Street, in the Pacific Beach area of San Diego.

The appellants are Bar West, LLC (Bar West) and Francis J. Reidy (Guarantor) (together, Appellants); and the respondents are Plotts Real Estate, LP (PRE), Thomas B. Plotts (Plotts), Paul W. Plotts, and TBP Financial, Inc. (TBP Financial) (together, Respondents). In the trial court, the plaintiff was PRE, and the defendants included Guarantor and Bar West; and the cross-complainants were Guarantor and Bar West, and the cross-defendants included PRE, Plotts, Paul W. Plotts, and TBP Financial.

Appellants identify the issues on appeal as: Whether the trial court erred (1) "in vacating the jury's award against [Plotts] on Bar West's claim of intentional interference with prospective economic advantage"; (2) "in concluding that [Guarantor] was not entitled to rescission of [his personal] Guaranty"; (3) "in finding that neither [of Appellants] was the prevailing party on their respective [cross-]claims"; and (4) "in awarding prejudgment interest to [PRE]" on its recovery under the complaint.

As we explain, Appellants did not meet their burden of establishing reversible error: (1) the trial court did not vacate the jury's award against Plotts;[1] and Appellants did not show that (2) the record fails to support the

_____

[1] The court ruled that PRE and Plotts were jointly and severally liable to Bar West in an amount that is half of what Bar West contends the jury awarded. As to the court's actual ruling, as we explain, the trial court did not err in concluding that Bar West suffered only one indivisible harm committed by a principal and its agent—i.e., PRE and Plotts—who are jointly and severally liable to Bar West.

2

court's ruling that Guarantor was not entitled to rescind his guaranty, (3) the court erred in determining that Appellants were not the prevailing parties, or (4) the court's award of prejudgment interest on PRE's claim for breach of contract was improper.

Accordingly, we will affirm the judgment.

## I.  FACTUAL BACKGROUND

In this part of the opinion, we will present the general factual background.  In discussing the various issues at part III., *post*, we will provide additional facts as necessary.

A.    *The Lease*

The disputes that resulted in the underlying litigation are between a landlord (and related parties) and a tenant (and a related party) with regard to the lease of commercial premises at 959 Hornblend Street in San Diego (Premises).

Effective January 1, 2007, Paul and Peggy Plotts, as trustees of a trust, leased the Premises to Westside Bar, LLC.  The written lease (Lease), prepared on an AIR Commercial Real Estate Association form, was for a 10-year term and contained two, five-year options to extend.

By October 2008, the trust had transferred its interest in the Lease to PRE, a limited partnership.  In October 2008, Westside Bar, LLC, assigned its interest in the Lease, including the options to extend, to Bar West.[2] Michael L. Reidy was the manager of Bar West, the assignee.  As part of the

---

[2]    At times, Bar West has been referred to as "MLR Bar West, LLC."  At least some of the trial exhibits refer to Bar West as "Bar West, LLC, a Delaware limited liability company, doing business in California as MLR Bar West, LLC."  According to the evidence at trial, they are "one and the same."  Since the parties do not distinguish between the two names, neither shall we.

3

same transaction, PRE released the guarantor under the Lease with Westside Bar, LLC, and entered into a guaranty of the newly-assigned Lease with Guarantor (Guaranty), Reidy's father.

Thus, as of and after October 2008, PRE (with general partner Patriot Capital and limited partner Plotts) was the landlord of the Premises, Bar West (with manager Reidy) was the tenant of the Premises, and Guarantor guaranteed Bar West's obligations under the Lease. A number of Lease provisions are at issue at this appeal. In general, they include:

- The terms and conditions of and related to the two, five-year options are contained at paragraph 30 of the Lease and at paragraph 52 of a Lease addendum. In part, paragraph 30.4(a) provides that the tenant has no right to exercise an option if the tenant is in breach of the Lease or if the landlord gives notice of a default and the tenant has not cured. Consistently, paragraph 30.4(c) provides that an option shall terminate if the tenant commits a breach of the Lease.

- Paragraph 1.7 of the Lease describes the "Agreed Use" of the Premises as "conducting sales of alcohol and food for the operation of a restaurant and bar." Paragraph 6.1 limits the tenant's "use and occup[ancy]" of the Premises to this agreed use and further requires the tenant's compliance with "the letter and spirit" of a 2005 injunction related to the Premises issued in an earlier case. Contained within the injunction is the requirement that the tenant "[c]omply with all regulations involving Alcoholic Beverage Outlets as set forth in San Diego Municipal Code . . . section 141.0502 as well as with all other applicable San Diego Municipal Code and Department of Alcohol Beverage Control [(ABC)] regulations."

4

- Paragraph 6.1 further requires the tenant to provide written notification to the landlord "within seven (7) days of receipt[] of any enforcement action undertaken by local, state, or federal police, fire, health department or enforcement agencies. Specifically, should a police investigation or enforcement action be conducted on the premises for failure to comply with City ordinances, or failure to comply with [ABC] guidelines/regulations," the tenant is required to "inform[] and advise[]" the landlord of the particulars.

- Paragraph 13.1 of the Lease provides: "A 'Default' is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A 'Breach' is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period . . . ."

Reidy testified that, in compliance with the "Agreed Use" of the Premises, Bar West obtained a "Type 47" liquor license. According to a trial exhibit, a Type 47 license requires the licensee to operate and maintain the licensed premises as "a bona fide eating place" at which the licensee "make[s] actual and substantial sales of meals, during the normal meal hours" that the establishment is open.[3] "Incidental, sporadic or infrequent sales of meals or

---

[3] In this regard, Business and Professions Code section 23038 defines " '[b]ona fide public eating place' " and " '[m]eals' " as follows: " 'Bona fide public eating place' means a place which is regularly and in a bona fide manner used and kept open for the serving of meals to guests for compensation and which has suitable kitchen facilities connected therewith, containing conveniences for cooking an assortment of foods which may be required for ordinary meals, the kitchen of which must be kept in a sanitary condition with the proper amount of refrigeration for keeping of food on said premises and must comply with all the regulations of the local department of health. 'Meals' means the usual assortment of foods commonly ordered at

a mere offering of meals without actual sales is not compliance." The ABC "will presume that a licensee is operating as a bona fide eating place if the gross sales of food prepared and sold to guests on the premises exceeds the gross sales of alcoholic beverages."

In Bar West's petition for its Type 47 license, Reidy expressly represented that "[t]he quarterly gross sales of alcoholic beverages shall not exceed the gross sales of food during the same period" (at times, the 50/50 Requirement[4]), that Bar West would maintain records that separately reflect the gross sales of food and the gross sales of alcohol, and that such records would be kept no less frequently than every quarter and made available to the ABC on demand. According to an ABC representative who testified at trial, the "main purpose" of a Type 47 license "is for the sales and service of food[;] . . . alcohol will be secondary to the food sales."

B.    *The Parties' Successful Claims*

As we explain *post*, the jury found in favor of PRE on its contract-based Lease claims, and the jury found in favor of Bar West on its cross-claim for intentional interference with prospective economic advantage. In an appeal from a judgment following a trial, we recite the evidence in a light most favorable to the judgment. (*Phillippe v. Shapell Industries, Inc.* (1987) 43 Cal.3d 1247, 1252; *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 286.) As applied here, therefore, our summary of the evidence related to the

_____

various hours of the day; the service of such food and victuals only as sandwiches or salads shall not be deemed a compliance with this requirement."

4      According to an ABC representative who testified at trial, the 50/50 Requirement is a condition placed on a license "to ensure [that the licensees] are not selling more alcohol than they are [selling] food."

6

disputes between the parties will depend on whether the evidence was in support of the claims on which the jury found in favor of PRE or the claim on which the jury found in favor of Bar West.

> 1. *PRE: Breach of Lease*

In or around September 2012, the ABC began an undercover investigation of Bar West by visiting and inspecting the Premises. The investigation continued on additional occasions over the course of the next few months. The results of the ABC's investigation were that Bar West was not acting as a bona fide eating place.

In early 2013, the ABC filed and served Bar West with an "Accusation under Alcoholic Beverage Control Act [Bus. & Prof. Code, § 23000 et seq.] and State Constitution" against Bar West (Accusation) based on its inspection and investigation of the Premises. (Some capitalization omitted.) Citing Business and Professions Code section 24200 and the California Constitution, Article XX, section 22, the ABC presented eight counts, each alleging "cause for suspension or revocation" of Bar West's "On-Sale General Eating Place" Type 47 license. The first five counts of the Accusation alleged a violation of "condition #1 on the license"—namely, the 50/50 Requirement. The remaining three counts alleged violations of specified statutes, including Business and Professions Code section 23038 (see fn. 3, *ante*),[5] that required the Premises to be "regularly and in a bona fide manner used and kept open for the serving of meals to guests for consumption . . . ."

---

[5] With record references that do not support their statement, Appellants incorrectly tell us that the Accusation was *not* based on the violation of a statute. Both the Accusation and an ABC representative who testified at trial confirm that the final three counts alleged violations of Business and Professions Code section 23038.

Approximately a week after having been served with the Accusation, "in accordance with" paragraph 6.1 of the Lease, Bar West notified PRE that it (Bar West) was "in a spot of trouble [with the ABC]" based on its lack of food sales.

In mid-March 2013, on behalf of Bar West, Reidy stipulated that disciplinary action could be taken on all eight counts of the Accusation. Based on this stipulation, the ABC ruled that: (1) grounds for suspension or revocation of the license had been established (Cal. Const., Art. XX, § 22; Bus. & Prof. Code, § 24200, subds. (a) & (b)); (2) Bar West violated or permitted violation of Business and Professions Code sections 23807, 23038, and 23396; and (3) Bar West's license be suspended for 10 days and indefinitely thereafter until compliance with Business and Professions Code section 23038. By the end of April 2013, Bar West had complied with section 23038, and in early May 2013, the 10-day license suspension was complete.

During the April – August 2013 time period, on multiple occasions, PRE requested from Bar West documentation and/or information which PRE believed it was entitled to under the terms of the Lease. The requests were made orally and in writing by both Plotts and PRE's attorney, and most were regarding Bar West's post-suspension compliance with requirements of the ABC and the Lease. Bar West and its attorney rarely responded or provided the requested materials.

In September 2013, PRE's attorney sent Bar West a demand to cure three identified defaults and gave notice of one "noncurable" default and PRE's remedy under the Lease. In October 2013, PRE's attorney sent Bar West a demand to cure an additional identified default. In November 2013, PRE's attorney sent Bar West a notice that PRE had applied

8

Bar West's security deposit to expenses related to the various defaults and demanded that Bar West replenish the security deposit and pay additional expenses related to the defaults.

In early December 2013, Plotts sent Reidy an email in which he (Plotts) set forth his position regarding Bar West's breaches of the Lease and "outlined options" for the parties under four new proposed Lease terms, each beginning the next month (Jan. 2014). Plotts concluded his email with the statement that, if Reidy did not respond to this offer in five days, PRE would "move forward" with an unlawful detainer action against Bar West and a civil suit for money damages against both Bar West and Guarantor. Reidy did not respond, the Lease was never rewritten, and PRE did not proceed with any litigation.

In mid-December 2013, Plotts and Reidy met at the Premises (December 2013 meeting). According to Reidy, Plotts informed him that, based on "the ABC violations," Bar West was in breach of the Lease and that, pursuant to the terms of the Lease, the two, five-year options were no longer available to Bar West.

Reidy wrote to Plotts in June 2014, explaining that, financially, Bar West had experienced "some of the worst weeks in our history." Reidy further told Plotts that Bar West had been losing money, was "unwilling to throw good money after bad any longer," and would not sign a new lease or a modification of the existing Lease. He suggested to Plotts that "the success of the location will only be insured by a new operator coming in and a rebranding of the location." Reidy proposed that, together, the two of them could find a new tenant (as assignee of Bar West's license), so long as PRE provided "a draft market rate lease with a 10[-]year term and one 5[-]year option" and other specifics.

9

Reidy's June 2014 letter closed by stating that, if PRE rejected the proposal of a new lease with a new tenant, Bar West "will be closing its doors as early as the end of the summer season[,] but no later than November 1st." Bar West stopped paying rent as of November 1, 2014 and abandoned the Premises effective November 19, 2014.

2. *Bar West: Intentional Interference with Prospective Economic Advantage*

In the summer of 2014, Bar West retained a commercial real estate agent to sell its business, including the transfer of its Type-47 license. The asking price was $695,000, and Bar West's agent had a list of terms that PRE would want in a new lease.

By mid-September 2014, the real estate agent had located a potential buyer (Buyer). On September 10, the agent prepared two written documents: (1) a letter of intent setting forth the principal terms and conditions for Buyer's purchase of "the business and assets" of Bar West; and (2) a proposal to PRE, signed by Buyer, for an assignment of the Lease to Buyer with two options to extend. On September 11, both Bar West and Buyer signed the letter of intent for a $595,000 cash transaction, and the agent forwarded to Plotts the signed proposed Lease assignment and extension.

Counsel for Plotts and PRE promptly responded, explaining that, before beginning its preliminary review of the proposal, PRE was: requesting a "$500 consideration fee" for a review of the proposal (as provided for in paragraph 12.2(e) of the Lease); asking for additional information about Buyer and the proposed personal guarantor; and advising that PRE would not agree to an assignment of the two options contained in the Lease (as provided for in paragraph 12.2(g) of the Lease).

Following the offer of the proposed assignment and extension of the Lease, Bar West, Buyer, and PRE made various counteroffers, demands, and

responses.  Two weeks after the initial proposal, the parties' negotiations concluded when, at the end of September 2014, PRE's attorney advised Bar West's attorney and real estate agent that PRE "ha[d] carefully reviewed, and rejected" Buyer's most recent counteroffer.

Reidy accused PRE of being unwilling to offer "a fair market lease for a successor."  Following his real estate agent's October 2014 advice, Reidy discontinued marketing the business.  By mid-November 2014, "things . . . had only gotten worse"; and Reidy closed the business, and Bar West surrendered possession of the Premises to PRE effective November 19, 2014.

## II.  PROCEDURAL BACKGROUND[6]

"The reviewing court will presume that the record in an appeal includes all matters material to deciding the issues raised."  (Cal. Rules of Court, rule 8.163.)  To this end, the appellant, who has the burden of overcoming the presumption of correctness (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609 (*Jameson*)), has the related duty of providing an appellate court with an adequate record on appeal.  (*In re Marriage of Wilcox* (2004) 124 Cal.App.4th 492, 498.)

---

[6]     In designating their record in this appeal, Appellants elected to proceed pursuant to California Rules of Court, rule 8.124, by which they committed to preparing and submitting an appendix in lieu of a clerk's transcript.  In violation of rules 8.124(b)(1)(A) and 8.122(b)(1)(F), Appellants failed to include in their appendix a copy of the register of actions.  As a "reviewing court" (Evid. Code, § 459, subd. (a)), we may take judicial notice of "[r]ecords of . . . any court of this state" (Evid. Code, § 452, subd. (d)).  We do so with respect to the trial court's register of actions in this case, San Diego County Superior Court No. 37-2015-00029139-CU-BC-CTL.  (*Shalabi v. City of Fontana* (2019) 35 Cal.App.5th 639, 641, fn. 1, review granted Aug. 14, 2019, S256665; *D. Cummins Corp. v. United States Fidelity & Guaranty Co.* (2016) 246 Cal.App.4th 1484, 1492, fn. 8.)

11

Here, Appellants have not provided us with us with the following documents: three of four of the operative pleadings on which the case went to trial; court minutes, including those from the 16 days of trial proceedings; and at least 10 of the post-verdict pleadings on which all of the rulings Appellants challenge in this appeal were based.[7] To the extent the record lacks any item necessary to a proper consideration of an issue or argument Appellants raise on appeal, Appellants necessarily will have failed to overcome the presumption of correctness that attaches to the judgment on appeal. (*Jameson*, *supra*, 5 Cal.5th at p. 609.)

In August 2015, PRE filed the underlying action.

In March 2016, Appellants filed a cross-complaint against Respondents and another party who Appellants dismissed prior to trial. In their cross-complaint, Appellants alleged eight causes of action, including a claim against Respondents (and the dismissed party) for intentional interference with prospective economic advantage and Guarantor's claim against PRE for rescission of the Guaranty. Because we do not have a copy of any response(s) to the cross-complaint, we do not know how Respondents responded.

Although the register of actions contains minutes "for Civil Jury Trial" dating as early as January 19, 2018, the first date of trial proceedings for which Appellants provided a reporter's transcript is March 29, 2018.

At trial, following the close of the evidence, the arguments of counsel, and the court's final instructions, the jury received two special verdict forms.

---

[7] By supplying copies of only what *they* submitted to the trial court, Appellants violated both the letter and spirit of California Rules of Court, rule 8.124(b)(1)(B)'s requirement that Appellants have included in their appendix "any item that [Appellants] should reasonably assume [Respondents] will rely on."

12

One is entitled "Plaintiff's Special Jury Verdict Form" and contains 31 numbered questions (PRE's Special Verdict). Although it does not identify the parties to or the claims alleged in the operative complaint (which is not in the record on appeal), PRE's Special Verdict indicates that the jury considered PRE's causes of action for: breach of contract (Lease) (question Nos. 1-9); breach of the implied covenant of good faith and fair dealing (Lease) (question Nos. 10-18); intentional misrepresentation (question Nos. 19-24); and negligent misrepresentation (question Nos. 25-31). The second form is entitled "Special Verdict Form on Cross-Complaint of Francis J. Reidy and MLR Bar West, LLC" and contains 26 numbered questions, some with subparts (Appellants' Special Verdict). Appellants' Special Verdict does not identify the parties or the claims alleged in the operative cross-complaint, but does indicate that the jury considered claims for: breach of contract (Lease) (question Nos. 1-6); breach of the implied covenant of good faith and fair dealing (Lease) (question Nos. 7-12); and intentional interference with prospective economic advantage (question Nos. 13-26).

By its two special verdicts dated April 24, 2018, the jury made the following findings with regard to the claims at issue in this appeal. On PRE's Special Verdict, the jury found on PRE's claim for breach of contract (Lease) that: Bar West breached the Lease; PRE was damaged in the amount of $486,483.67; and Guarantor was responsible for damages in the amount of $486,483.67. On Appellants' Special Verdict, the jury found on Appellants' cross-claim for intentional interference with prospective economic advantage that: if the Lease had not been terminated, Bar West would have been able "to sell its business and liquor license to an incoming tenant of the [Premises]"; TBP Financial did not wrongfully request potential tenants to pay certain fees (i.e., TBP Financial did not interfere with these potential

13

tenants' interest in the purchase of Bar West's attempt to sell its business and liquor license); however, PRE and Plotts *each* knew of Bar West's intent to sell its business and liquor license and to assign the Lease, *each* refused to negotiate with and/or accept reasonable terms for a new lease with potential tenants, *each* intentionally interfered with Bar West's prospective economic advantage in the sale of its business and assets, *each* acted in a manner that was a substantial factor in causing harm, and *each* caused "actual damages" in the amount of $254,228.10.

After discharging the jury, the court set a date for the continued proceedings, at which the court and counsel agreed on the issues to be decided by the court, a briefing schedule, and a hearing date in late August 2018.

In preparation for the continued proceedings on August 30, 2018, the court issued a tentative ruling based on the issues identified in the parties' post-verdict briefing. The court entertained lengthy oral argument and took the matter under submission, with the understanding that Appellants' counsel would be requesting a statement of decision.

On November 8, 2018, in a "Final Statement of Decision" (FSOD), the court ruled on the issues that the parties raised in the post-verdict briefing. As relevant to the issues on appeal, the court's rulings included:

- The damages awarded by the jury on Appellants' cause of action for intentional interference with prospective economic advantage total $254,228.10, *jointly and severally against PRE and Plotts*;
- Guarantor is not entitled to relief on his cause of action for rescission of the Guaranty;
- Neither Bar West nor Guarantor is the prevailing party; and

14

- PRE is entitled to an award of prejudgment interest, calculated at the rate of 10 percent per year.

In late January 2019, the trial court filed its judgment. Containing a full recitation of PRE's Special Verdict, Appellants' Special Verdict, and the FSOD, the judgment awarded: damages in favor of PRE, jointly and severally against Bar West and Guarantor; $254,228.10 in favor of Appellants and against PRE and Plotts, jointly and severally; and a judgment in favor of Paul W. Plotts and TBP Financial on Appellants' cross-complaint. The judgment further deemed PRE to be the prevailing party in the action as against Appellants, and Paul W. Plotts and TBP Financial as the prevailing parties on Appellants' cross-complaint.

Appellants timely appealed from the judgment.

## III. DISCUSSION

Appellants raise four issues on appeal, arguing that the trial court erred in: (1) awarding Appellants $254,228.10, jointly and severally against PRE and Plotts, as opposed to $254,228.10 against PRE and $254,228.10 against Plotts; (2) ruling against Guarantor on his cause of action for rescission of the Guaranty; (3) not finding Bar West and Guarantor to be prevailing parties; and (4) awarding PRE prejudgment interest. As we explain in discussing each of these issues, Appellants did not meet their burden of establishing reversible error as to any of them.

A.    *Joint and Several Liability for Damages Awarded Against Respondents*

Appellants argue that the trial court erred in ruling that PRE and Plotts were jointly and severally liable to Bar West for damages in the amount of $254,228.10.

15

1. *Additional Facts*

In response to separate sets of questions in Appellants' Special Verdict, the jury found in favor of Appellants and against both PRE and Plotts on Appellants' claim for intentional interference with prospective economic advantage. The underlying premise for this claim was the jury's finding that, if the Lease had not been terminated, Bar West "would . . . have been able to sell its business and liquor license to an incoming tenant of the [Premises]." At issue on appeal are the jury's *identical* findings against two *individual* cross-defendants: PRE caused actual damages to Bar West in the amount of $254,228.10, and Plotts caused actual damages to Bar West in the amount of $254,228.10.[8]

In its FSOD, the trial court concluded that "the amounts awarded on [Appellants'] cross-complaint should not be aggregated." The court explained that "Bar West suffered only one single harm for intentional interference with prospective economic advantage as against the cross-defendants, [PRE and Plotts,] in the total amount of $254,228.10."

---

[8]    In two separate sets of identical questions, one directed to cross-defendant PRE's involvement and one directed to cross-defendant Plotts's involvement, Appellants' Special Verdict read as follows at questions Nos. 21 and 23:
   a. Did PRE and did Plotts "know of [Bar West's] intention to sell its business and liquor license and to assign its Lease? [¶] Yes _X_ No ___"
   b. Did PRE and did Plotts "refuse to negotiate with and/or accept reasonable lease terms from potential tenants? [¶] Yes _X_ No ___"
   c. Did PRE and did Plotts "intentionally interfere with [Bar West's] prospective economic advantage in the sale of its business and assets? [¶] Yes _X_ No ___"
   d. "Was the above conduct [of PRE and of Plotts] a substantial factor in causing harm to [Bar West]? [¶] Yes _X_ No ___"
Question Nos. 22 and 24 read as follows: "What are [Bar West's] actual damages" caused by PRE and caused by Plotts? "$_254,228.10_."

16

The trial court analyzed the issue as follows. Plotts was a partner of PRE, and Appellants presented no evidence either that PRE acted separately from Plotts or that Plotts ever acted in a capacity outside that of a partner of PRE. Thus, to the extent Plotts interfered with Bar West's prospective economic advantage—and the jury so found—he did so *as a partner of PRE*. In its cross-complaint, Bar West alleged only one theory of intentional interference with prospective economic advantage against PRE and Plotts; and, consistently, at trial Bar West presented "the same exact evidence" against both PRE and Plotts. The award of $254,228.10 was "a clearly calculated finite special damage," not an award of general damages; and to allow a recovery of $508,456.20, as argued by Appellants, would amount to "[d]ouble or duplicative recovery for the same items of damage," which is prohibited.

2.    *Analysis*

a.    *Law*

The measure of damages for intentional interference with prospective economic advantage is the "economic harm proximately caused by the defendant's action." (*Roy Allan Slurry Seal, Inc. v. American Asphalt South, Inc.* (2017) 2 Cal.5th 505, 512; see CACI No. 2202.) This "includes '[t]he financial loss of the benefits of the [contract] [or] [the prospective economic relationship].' " (*Sole Energy Co. v. Petrominerals Corp.* (2005) 128 Cal.App.4th 212, 233 (*Sole Energy*).) The " ' " 'expectancies' " ' " protected are based on " ' "a background of business experience" ' " from which " ' "it is possible to estimate with some fair amount of success both the value of what has been lost and the likelihood that the plaintiff would have received it if the defendant had not interfered." ' " (*Roy Allan Slurry Seal*, at p. 515, italics omitted.)

17

A special verdict is one "by which the jury find[s] the facts only, leaving the judgment to the Court." (Code Civ. Proc., § 624; accord, *Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1347, fn. 7.) The purpose of a special verdict is for the jury to determine the ultimate facts of each claim in the case, so that "nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.)

To the extent there is an ambiguity in the special verdict that is not raised before the jury is discharged, the court must " 'interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.' " (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 456 (*Woodcock*); accord, *Fuller v. Dept. of Transportation* (2019) 38 Cal.App.5th 1034, 1038 (*Fuller*) [consider pleadings, evidence, instructions, and arguments]; *Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 718-719 [consider evidence, instructions, and arguments].)

Because a " ' "special verdict's correctness must be analyzed as a matter of law" ' " (*Orthopedic Systems, Inc. v. Schlein* (2011) 202 Cal.App.4th 529, 543), on appeal we review de novo the trial court's interpretation of the special verdict (*Fuller*, *supra*, 38 Cal.App.5th at p. 1038). Only where the special verdict is "hopelessly ambiguous" will the judgment be reversed. (*Woodcock*, *supra*, 69 Cal.2d at p. 457; accord, *Fuller*, *supra*, 38 Cal.App.5th at p. 1038 [court interprets special verdict so long as it "is not 'hopelessly ambiguous' "].)

As we explain, because Appellants have not attempted to apply the proper standard—i.e., Appellants have not suggested how the pleadings, evidence, instructions, and argument of counsel support the interpretation Appellants advance (*Woodcock*, *supra*, 69 Cal.2d at p. 456; *Fuller*, *supra*, 38 Cal.App.5th at p. 1038)—they cannot establish reversible error.

18

### b. *Appellants' Arguments*

Appellants' primary argument is that the trial court erred in reaching the legal conclusion that PRE and Plotts are jointly and severally liable to Appellants in the amount of $254,228.10. According to Appellants, PRE and Plotts are *each* independently liable for Appellants' financial loss of the benefits of the prospective economic relationship with a buyer of the business and/or assignee of the Lease in the amount of $254,228.10 *each*—for a total award of $508,456.20.

In support of their argument, Appellants rely on the Restatement Third of Torts, which provides: "Each person who commits a tort that requires intent is jointly and severally liable for any indivisible injury legally caused by the tortious conduct." (Rest.3d Torts, Apportionment of Liability, § 12.) Appellants then cite to California authorities that preclude apportioning liability for a party that commits an intentional tort. (E.g., Code Civ. Proc., § 875, subd. (d) ["There shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person"]; *Kesmodel v. Rand* (2004) 119 Cal.App.4th 1128, 1144, fn. 37 [" 'a party who commits intentional misconduct should not be entitled to escape responsibility for damages based upon the negligence of the victim or a joint tortfeasor' "]; *Thomas v. Duggins Construction Co., Inc.* (2006) 139 Cal.App.4th 1105, 1112 ["an intentional tortfeasor's liability to the plaintiff is not subject to apportionment (i.e., reduction) where the negligence of one or more third party tortfeasors contributed to the injuries"]; *id.* at pp. 1108, 1111 [Prop. 51, which in part abolished joint liability for noneconomic damages based on principles of comparative fault (Civ. Code, § 1431.2, subd. (a)), did not alter existing principles governing intentional joint tortfeasors joint and several liability to the injured party].)

19

None of these authorities, however, is applicable to the present case, since each involves contribution by a negligent joint tortfeasor; whereas, with intentional torts, as here, the proper focus is on the injury to the victim, not comparative fault.  Under Appellants' principal authority, joint and several liability applies "for any indivisible injury legally caused by the [intentionally] tortious conduct."  (Rest.3d Torts, Apportionment of Liability, § 12.)  The issue, and thus the relevant inquiry, is whether Appellants suffered an "indivisible injury."  (*Id.* at § 7, com. e.)  An injury is indivisible only if "each relevant person caused the entire injury."  (*Ibid*.)  As the Restatement explains:

> "(b) Damages can be divided by causation when the evidence provides a reasonable basis for the factfinder to determine:

> > "(1) that any legally culpable conduct of a party or other relevant person to whom the factfinder assigns a percentage of responsibility was a legal cause of less than the entire damages for which the plaintiff seeks recovery and

> > "(2) the amount of damages separately caused by that conduct.

> "*Otherwise, the damages are indivisible and thus the injury is indivisible.*" (*Id.* at § 26, italics added.)

"The concept, at bottom, is one of legal causation (that is, are multiple tortfeasors responsible for the plaintiff's injuries) . . . .  As the Supreme Court explained in *American Motorcycle* [*Assn. v. Superior Court* (1978)] 20 Cal.3d [578,] 587, '[T]he "joint and several liability" label . . . simply embodies the general common law principle . . . that a tortfeasor is liable for any injury of which his [tort] is *a* proximate cause.' " (*Henry v. Superior Court* (2008) 160 Cal.App.4th 440, 454.)  "[U]nless damages can be divided by causation, 'the

20

damages are indivisible and thus the injury is indivisible.' " (*Ibid.*, quoting Rest.3d Torts, Apportionment of Liability, § 26.)

Under this standard, the trial court properly analyzed the issue, ruling in relevant part:

> "[U]nder California law . . . a party can only recover once for a single harm. . . . Bar West presented the same exact evidence at trial against both [Plotts] and [PRE]. It is clear by the [Appellants' Special Verdict] that Bar West alleged only one theory of intentional interference with prospective economic advantage against two interrelated parties. The jury found [Plotts's] actions on behalf of [PRE] resulted in *one harm to Bar West in the amount of $254,228.10. . . .* The court finds the two awards of $254,228.10 are special damages under one theory of recovery, and therefore, they are not awarded twice under the facts presented in this case.
>
> "At trial, the jury was informed [Plotts] was a partner in [PRE]. Bar West did not offer any evidence [Plotts] ever acted in a capacity outside his official capacity as a partner of [PRE]. There was some evidence that [Plotts] allegedly interfered with Bar West's sale of the business. . . . [PRE] could not have acted separate and apart from the actions of [Plotts] . . . . The liability of [PRE] can only be established through the actions of [Plotts]. As such, the amounts awarded on the cross-complaint should not be aggregated, as *there was only one action and one harm*." (Italics added.)

In this latter regard, in their cause of action for intentional interference with prospective economic advantage, Appellants did not differentiate between PRE and Plotts or between what either of them did or did not do. For example, in their cross-complaint, Appellants pleaded: "In this case, a prospective business relationship existed between BAR WEST and potential purchasers of its business as a going concern, for which there was a 'probability of future economic benefit' from a business relationship. Cross-Defendants, and each of them, did in fact cause injurious interference in that

21

protective economic advantage. [¶] . . . [T]he conduct of Cross-Defendants was wrongful in and of itself . . . ." In addition, at trial, Appellants (through counsel) stipulated: (1) "that all substantive matters relating to the Lease, including without limitation negotiations or discussions concerning the Lease, the assignment of the Lease to Bar West, or any options to extend the Lease, were handled by [Plotts] while acting as an agent [for PRE]"; and (2) "that [Plotts] was authorized by [PRE] to act on its behalf at all times, and [PRE] is bound by the testimony and actions of [Plotts] in this case, without exception, and no assertions of ultra vires conduct will be made by [PRE]."[9]

In summary, therefore, the trial court properly analyzed the issue in terms of the (in)divisibility of Appellants' injuries caused by PRE and Plotts; and Appellants have not argued otherwise, despite having relied on the Restatement Third of Torts.

Nor are we persuaded by Appellants' remaining arguments.

Appellants argue that "[s]ubstantial evidence supports" a finding that PRE and Plotts "caused damages to Bar West totaling $508,456.20." (Bolding omitted.) In support of their argument, Appellants cite to the following

_____

[9] In their reply brief on appeal, Appellants tell us that "the Jury also heard evidence of wrongful and tortious conduct by [Plotts] that was outside of his role as agent for [PRE]." Appellants' failure to properly raise this argument in their opening brief forfeits its consideration in reply. (*Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 518 [" ' " 'Obvious considerations of fairness in argument demand that the appellant present all of his points in the opening brief' " ' "].) In any event, the allegedly "tortious conduct" Appellants describe (Plotts's alleged threats to Reidy and his family) is irrelevant to the interference with, as described in Appellants' Special Verdict, Bar West's prospective economic advantage in either "rebrand[ing] and continu[ing] successful operation of its business" or "sell[ing] its business and liquor license to an incoming tenant of the property."

22

evidence: Bar West listed its business and liquor license for sale for $695,000 in the summer of 2014; Bar West and Buyer entered into a letter of intent for the sale of the business and liquor license to Buyer for $595,000 in September 2014;[10] and Reidy offered to sell the license to Plotts for $600,000 in July 2015. However, that evidence, without more, does not establish *damages*. At best it is evidence of the potential price a buyer might pay for the business and license or for the license alone, not evidence of the financial loss of the benefits of a prospective economic relationship, as required to establish damages. (*Sole Energy*, *supra*, 128 Cal.App.4th at p. 233.) Moreover, in closing argument, the only mention of damages on Appellants' claim for intentional interference with prospective economic advantage was from Appellants' counsel, who suggested to the jury that, based on the evidence from Appellants' expert, "if Bar West had been able to sell its business and liquor license in January of 2014, *its damages are $1,794,577*." (Italics added.)

Next, *without a record reference*, Appellants tell us in their opening brief that "the Jury was instructed that it would be asked to decide whether

---

10    Actually, Appellants tell us that "Bar West *reached an agreement* to sell its business and liquor license to [Buyer] for $595,000." (Italics added.) That statement misrepresents the evidence that Appellants submitted and relied on at trial and which they cite in their appellate brief. The "Letter of Intent to Purchase the Business Assets of MLR Bar West, LLC," trial exhibit No. 572, prepared by Bar West's broker, concludes in uppercase bold font: "[T]his proposal is not a purchase/sale agreement . . . . [O]nly a fully executed purchase/sale agreement shall constitute an agreement for the business. Broker makes no warranty or representation to seller or purchaser that acceptance of this proposal will guarantee the execution of a purchase and sale agreement for the business. The final purchase/sale agreement shall incorporate . . . any other provisions upon which both parties may mutually agree."

each of the [Cross-]Defendants are liable for causing harm to Bar West for lost profits and business value and, if so, the amount of harm that was caused by each." However, as we learn from their reply brief, where Appellants quote from and provide a record reference for the instructions on which they rely, the statement in their opening brief misrepresents the record. Contrary to Appellants' initial presentation, the instructions do not direct the jury to determine—and, indeed, do not even mention consideration of—"the amount of harm that was caused by each [cross-defendant]."

Finally, Appellants argue that the trial court's "statements are not supported by substantial evidence" and "[a]re contrary to the substantial evidence." (Some bolding omitted.) However, Appellants do not tell us *which* "statements" of the court they contend lack substantial evidence. Moreover, in the procedural context of how the issue arises in this case—i.e., given Appellants' Special Verdict—we are not reviewing on appeal any factual findings made by the trial court. The *jury* made all the necessary factual findings, and the *court* then "dr[e]w from them conclusions of law" in the form of a judgment. (Code Civ. Proc., § 624.) To the extent Appellants contend that factual findings are unsupported by substantial evidence, their contention must be directed to the jury's *findings of fact*, not to the court's conclusions of law.

Based on our de novo review of the pleadings, evidence, instructions, and closing arguments of counsel, the trial court's interpretation of the damages awarded on Appellants' Special Verdict is not hopelessly ambiguous. For this reason, Appellants did not meet their burden of establishing that the trial court erred in ruling that the amounts awarded on Appellants' claim for intentional interference with prospective economic advance "should not be

24

aggregated" and that, instead, PRE and Plotts should be jointly and severally liable in the amount of $254,228.10.

B. *Rescission*

Guarantor argues that the trial court erred in denying him relief based on the cause of action for rescission of the Guaranty alleged in the cross-complaint.

1. *Additional Facts*

The Guaranty is a two-page commercial real estate form pursuant to which Guarantor "unconditionally and irrevocably guarantee[d] the prompt payment by [Bar West] of all rents and all other sums payable by [Bar West to PRE] under said Lease and the faithful and prompt performance by [Bar West] of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by [Bar West]."

In the second cause of action of the cross-complaint, Guarantor sued PRE for rescission of the Guaranty. In part, Guarantor alleged that, despite the language of the Lease regarding the two, five-year options (after the initial 10-year term), PRE had a "hidden intention to assert that the options were not exercisable by Bar West"; and had Guarantor known of this hidden intention, he would not have provided the Guaranty.

In a post-verdict filing, Guarantor requested a ruling from the court "that he has no further financial obligations related to the Lease or the jury's award of damages to [PRE]."[11] In the request, Guarantor explained his

---

[11]     Guarantor does not tell us why the court was ruling on the issue of rescission. We assume the reason is that a cause of action for rescission of a contract is an equitable claim for which there is no right to a jury trial. (*Nmsbpcsldhb v. County of Fresno* (2007) 152 Cal.App.4th 954, 962-963 [no right to jury trial on claim for rescission, because it is an equitable action].)

25

position as follows: The two, five-year options to extend the Lease were "essential" to his willingness to provide the Guaranty; the "undisputed evidence" from the trial established that, without the options, Guarantor would not have signed the Guaranty; further "undisputed evidence" from the trial established that PRE "terminated the options in the Lease and voided the Lease in its entirety at the December 2014 [*sic*] meeting"; and, thus, "it is undisputed that the consideration for [Guarantor's] financial promises failed and the Guaranty was rescinded by [PRE]'s conduct."

As to Guarantor's rescission claim, the trial court's tentative decision provided in full, "The court denies Bar West's [*sic*] request for rescission." Appellants timely requested a statement of decision "explaining the factual and legal bases for the Court's tentative decision . . . regarding . . . [¶] . . . [¶] . . . [w]hether [Guarantor] is entitled to Judgment of rescission of the Guaranty." In the FSOD, the court ruled that PRE did not prematurely (or otherwise) terminate the options, as contended by Appellants; i.e., neither PRE nor Plotts repudiated the Lease at the December 2013 meeting. Instead, by vacating the Premises and failing to pay rent as of November 2014, Bar West (1) was in breach of the Lease, and (2) would not be the tenant at the prescribed time for exercising the first option two years later.[12]

2. *Analysis*

On appeal, Appellants argue that, contrary to the trial court's ruling in the FSOD, PRE repudiated the Lease when, according to Reidy: (1) in early

---

[12] Paragraph 39.4(a) of the Lease provides that Bar West "shall have no right to exercise an Option" during a period of time in which "(ii) . . . any Rent is unpaid" or "(iii) . . . [Bar West] is in Breach of this Lease[.]"

Paragraph 1.3 of the Lease provides that the original term ends on December 31, 2016; and paragraph 52.A.(i) of the Lease requires that, "[i]n order to exercise an option to extend, [Bar West] must give written notice of

26

December 2013, Plotts sent Reidy an email that (a) described Bar West's breaches of the Lease and offered general terms for four possibilities to replace the Lease beginning January 2014, none of which contained options to extend, and (b) threatened litigation against Bar West and Guarantor if Reidy did not respond to this offer in five days; (2) at the December 2013 meeting, Plotts told Reidy both that the Lease was "null and void" and that the two, five-year options were no longer available; and (3) nine months later, in September 2014, PRE's attorney stated that, even if Bar West were able to assign the Lease to a new tenant, the two, five-year options would not be included. Appellants' argument concludes with the contention that this (and other related) conduct "removed the consideration for the Guaranty."

As potentially applicable in this case, a guaranty may be terminated by rescission (Civ. Code, § 1688), if the consideration for the guaranty fails through no fault of the guarantor (*id*., § 1689, subd. (b)(2)).[13] Here, with regard to consideration, Guarantor testified that he would not have signed the Guaranty had the Lease not contained the two, five-year options.

Appellants essentially argue that, based on Plotts's early December 2013 email, Plotts's statements at the December 2013 meeting, and PRE's counsel's letter nine months later—in particular, the communication that the two, five-year options were no longer available—the trial court *was required* to rule that PRE's conduct anticipatorily repudiated the Lease. Appellants'

---

such election to [PRE]" between April 1 and October 1, 2016—"time being of the essence."

[13]     Although Civil Code section 1689 provides for, and in the cross-complaint Guarantor alleges, other grounds on which a contract like the Guaranty may be terminated by a rescission, on appeal Appellants argue, and thus we consider, only a failure of consideration (*id*., § 1689, subd. (b)(2)).

argument continues:  Since the two, five-year options contained in the repudiated Lease were the consideration to Guarantor for his Guaranty, the court *was required* to rule that Guarantor is entitled to rescind the Guaranty because the consideration for the Guaranty failed.

However, Appellants' argument does not take into consideration the trial court's explanation of its reasoning for ruling that "there was not a legal repudiation of the [L]ease by [Plotts] or [PRE] at the December 2013 meeting with [Reidy]."  In finding that "[PRE] and Bar West *both continued to affirm* the [Lease] and [G]uaranty by [Guarantor] after the December 2013 meeting," the court relied on the following facts:  "[N]either party took any legal action following the December 2013 meeting.  Bar West continued to pay the rent due under the [L]ease.  [Plotts] continued to accept the rent. [Guarantor] testified in trial that none of the terms of the [L]ease had changed following the December 2013 meeting."  (Italics added.)

An injured party may waive its right to rescind a contract "by conduct (such as retention of benefits) indicating *an election to affirm the contract*." (1 Witkin, Summary of Cal. Law (11th ed. 2020) Contracts, § 969, p. 1019, italics added.)  This is not a new concept.  More than 100 years ago, our Supreme Court described as "too familiar to require the citation of authority" the following rule:  "[I]f a person entitled to rescind goes on, after he discovers the facts which give him the right and knows that he has the right, to deal with the property involved as if the contract . . . were still in effect, he affirms the contract . . . [, then] his right to rescind it is gone."  (*Bancroft v. Woodward* (1920) 183 Cal. 99, 111.)  Reaffirming *Bancroft* more than 75 years ago, our high court summarized:  "Waiver of a right to rescind will be presumed against a party who, having full knowledge of the circumstances which would warrant him in rescinding, nevertheless accepts and retains

28

benefits accruing to him under the contract." (*Neet v. Holmes* (1944) 25 Cal.2d 447, 458.) The facts in *Bancroft*, although the converse of those in the present appeal, are remarkably similar. There, after a landlord was fully aware of his rescission rights and had sued to rescind a lease, he continued to collect rents. (*Bancroft*, at p. 111.) Because the collection of rents "was [an] unequivocal affirmance of the lease," it "destroyed whatever right of rescission he might theretofore have had." (*Neet*, at p. 458, citing *Bancroft*.)

" 'Whether or not a person has . . . elected to affirm [a contract] rather than to rescind it, depends primarily upon his intention, and this is shown by his declarations, his acts, or his conduct, which . . . is therefore, a question of fact . . . .' " (*Esau v. Briggs* (1948) 89 Cal.App.2d 427, 438 (*Esau*).) Thus, we review for substantial evidence the trial court's finding that both PRE and Bar West "continued to affirm" the Lease after the December 2013 meeting.[14] We then review for an abuse of discretion the trial court's decision whether to grant relief based on rescission. (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 401.)

The most substantial of the evidence in support of the court's principal finding is that, regardless what Plotts said or PRE did from December 2013

---

[14] Appellants tell us that "[t]he Trial Court's findings of fact are contrary to the substantial evidence." (Underscoring omitted.) However, " 'the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the [factual finding made].' " (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571, quoting *Crawford v. Southern Pac. Co.* (1935) 3 Cal.2d 427, 429.) The fact that the record may contain substantial evidence in support of the finding Appellants wanted the court to make is irrelevant to our role, which is limited to a determination of the sufficiency of the evidence *in support of the judgment actually made.* (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.)

29

forward: As of December 1, 2013, Bar West was current on its rent; from December 2013 through October 2014, Bar West paid rent; and, according to Reidy, the terms and conditions of the Lease all "stayed in place." In part, Guarantor agreed; Plotts's statements and PRE's actions from and after the December 2013 meeting did not change the rent or language in the Lease. In addition, if we consider the actions of Plotts and PRE, they further substantiate the finding that the parties affirmed the Lease after the December 2013 meeting: At all times from and after the December 2013 meeting until Bar West surrendered possession of the Premises in November 2014, Plotts believed and proceeded with the understanding that the Lease was in full force and effect; PRE never again mentioned preparation of a new lease; and PRE never instituted litigation.

Accordingly, we have no difficulty concluding that the record contains substantial evidence to support the court's finding that Bar West and PRE "both continued to affirm the [Lease] and [G]uaranty by [Guarantor] after the December 2013 meeting."

Based on this finding, we also have no difficulty concluding that the trial court did not abuse its discretion in ruling that "there was not a legal repudiation of the [Lease] . . . at the December 2013 meeting . . . ." That is because, to constitute an express repudiation as Appellants argue, Plotts's statement or PRE's conduct "must amount to an unequivocal refusal to perform[.]" (*Taylor v. Johnston* (1975) 15 Cal.3d 130, 140 (*Taylor*).) " 'A mere declaration, however, of a party of an intention not to be bound will not of itself amount to a breach, so as to create an effectual renunciation of the contract; for one party cannot by any act or declaration destroy the binding force and efficacy of the contract. To justify the adverse party in treating the renunciation as a breach, the refusal to perform must be of the whole contract

30

. . . and must be distinct, unequivocal and absolute.' " (*Ibid*.) Thus, contrary to the premise of Guarantor's argument, PRE's statement regarding the enforceability of the Lease generally or the availability of the options specifically did not "destroy the binding force and efficacy" of the Lease. (*Ibid*.)

In support of his argument that PRE repudiated the Lease, Guarantor tells us that his case "is factually similar to" *McWilliams v. Holton* (1967) 248 Cal.App.2d 447. We disagree; in fact, *McWilliams* illustrates why, in this case, the trial court properly ruled that PRE did not repudiate the Lease. In *McWilliams*, the landlord gave the tenant a 30-day notice to quit and surrender possession of the premises, thereby formally "cancelling the lease agreement" and "complet[ing the landlord's] repudiation of the lease" (*id*. at pp. 451-452)—i.e., a distinct, unequivocal, and absolute refusal to perform. By contrast, here all we have is evidence of what the landlord threatened he might do at some later date (which he did not do).

Moreover, even if we were to assume that PRE repudiated the contract, then Bar West immediately faced an "election of remedies" after the December 2013 meeting. (*Taylor*, *supra*, 15 Cal.3d at p. 137.) Bar West was required to "treat the repudiation as an anticipatory breach and immediately seek damages for breach of contract, thereby terminating the contractual relation between the parties, or [to] treat the repudiation as an empty threat, wait until the time for performance [of the exercise of the options] arrive[d] and exercise [its] remedies for actual breach if a breach d[id] in fact occur at such time." (*Ibid*.) Here, because *Bar West elected to treat the Lease "as still in force*," any potential repudiation was "nullified," and Bar West was "left with [its] remedies, if any, invocable at the time of performance." (*Id*. at pp. 137-138.)

31

We are not persuaded by Guarantor's arguments to the contrary, as we explain.

The FSOD contains a number of factual findings. Guarantor argues first that the following three findings, while not verbatim from the FSOD, are unsupported by substantial evidence:

1. "Reidy agreed Bar West was in breach of the [L]ease";

2. "[T]here was no evidence presented that [Plotts] ever manifested an unequivocal refusal to perform under the Lease"; and

3. "[Guarantor] testified in trial that none of the terms of the Lease had changed following the December 2013 meeting."

Because Guarantor tells us nothing else about the evidence, his presentation is what the Supreme Court describes as "manifestly deficient" and results in forfeiture of appellate review of his substantial evidence issue and argument. (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.) Unless the "party who challenges the sufficiency of the evidence to support a finding . . . set[s] forth, discuss[es], and analyze[s] *all the evidence* on that point, both favorable and unfavorable," the reviewing court may deem the substantial evidence contention to have been waived or forfeited. (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218, italics added; accord, *Fink*, at p. 887; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) Indeed, " 'the burden to provide a fair summary of the evidence "grows with the complexity of the record." ' " (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 650.)

In any event, whether "Reidy agreed Bar West was in breach of the [L]ease" (i.e., the first finding) is irrelevant to the analysis that resulted in the determination that PRE did not repudiate the Lease. The second finding, that "there was no evidence presented that [Plotts] ever manifested an

unequivocal refusal to perform under the Lease," directly challenges how the trier of facts weighed and credited the evidence of what Appellants describe as the "unequivocal refusal to perform under the Lease." As a reviewing court, we "may not weigh the evidence or consider the credibility of witnesses." (*Campbell v. General Motors Corp.* (1982) 32 Cal.3d 112, 118.) Finally, as to the finding that "Guarantor testified . . . that none of the terms of the Lease had changed following the December 2013 meeting," Guarantor's assertion that the finding lacks substantial evidence directly contradicts Guarantor's testimony at trial.[15]

The FSOD also contains a number of legal conclusions. Guarantor argues next that the following three statements, while not verbatim from the FSOD, are erroneous conclusions of law by the trial court:

1. "The [L]ease required Bar West to comply with the ABC";[16]

2. "The breach made the options unavailable pursuant to the lease; the ABC breach by Bar West rendered the options void; the options were no longer available to Bar West since it was in breach of Section 39 of the [L]ease"; and

3. "[PRE] and Bar West both continued to affirm the contract and [G]uaranty after the December 2013 meeting," and "neither party took any legal action following that meeting."

---

[15] Specifically, Respondents' counsel asked Guarantor whether, as a result of the December 2013 meeting, any provisions of the Lease changed. Guarantor answered, "No words changed in the Lease," which certainly substantiates the court's finding.

[16] Guarantor also challenges the legal conclusion "that Bar West was in breach of the Lease for failing to comply with the ABC," while nonetheless acknowledging that such a conclusion is "not stated expressly."

Since we have based our conclusion that the court did not abuse its discretion in ruling that PRE did not repudiate the Lease on the substantiated finding that both Bar West and PRE affirmed the Lease after the December 2013 meeting, there is no need to reach—and we express no opinion on—Guarantor's first two claimed errors.

Guarantor's third claimed error is that PRE and Bar West affirmed the agreements, and that neither party took legal action. Guarantor argues that, because "the parties attended two mediations to attempt to resolve these disputes" concerning alleged defaults under the Lease after the December 2013 meeting, PRE "unequivocally refused to perform." As we set forth *ante*, the determination whether PRE and/or Bar West affirmed the Lease are questions of fact, not law (*Esau*, *supra*, 89 Cal.App.2d at p. 438), and the record here contains more than substantial evidence to support the court's express finding that both PRE and Bar West "continued to affirm" the Lease after the December 2013 meeting. Likewise, the determination whether either party "took any legal action following that [December 2013] meeting" is a question of fact; and as we explained *ante*, the finding that neither party took any legal action is supported by the uncontradicted evidence that no lawsuit was filed until August 2015 (i.e., this action), nine months after Bar West surrendered possession of the Premises.[17]

As a final argument, at oral argument, Guarantor's counsel suggested that, because *the jury found that the Lease had been terminated*, the court erred in not ruling, as a matter of law that PRE had repudiated the Lease. In

---

[17] With no litigation to disavow the Lease pending, attendance at a mediation does not suggest, let alone require, the legal conclusion that the parties did not affirm the Lease.

34

particular, counsel relied on the jury's answers to question Nos. 13 and 20 of Appellants' Special Verdict, which provide as follows:

> "Question 13. *If the Lease had not been terminated*, would [Bar West] have been able to rebrand and continue successful operation of its business? [¶] Yes _X_ No __"

> "Question 20. *If the Lease had not been terminated*, would [Bar West] have been able to sell its business and liquor license to an incoming tenant of the property? [¶] Yes _X_ No __"

Guarantor did not assert this argument in his appellate briefing; thus, by raising it for the first time at oral argument, he forfeited appellate review. (*Bayramoglu v. Nationstar Mortgage LLC* (2020) 51 Cal.App.5th 726, 738, fn. 4, quoting *Kinney v. Vaccari* (1980) 27 Cal.3d 348, 356, fn. 6.) Even if we were to reach the merits, however, the result would be no different, because in neither of the two special verdict questions was the jury asked to determine—nor did the jury find—that the Lease had been terminated (and, if so, by whom and when). The question tells the jury, first, to assume that the Lease had been terminated and, second, to make a factual finding whether Bar West would have been able either to rebrand and continue or to sell the business and license. Counsel's suggestion otherwise misrepresents both what the jury was asked to do and what it did.

In summary, substantial evidence supports the trial court's finding that the Lease, *including the applicability of the terms and conditions for the exercise of the options*, remained in full force and effect until Bar West surrendered possession in November 2014. Thus, the court did not err in concluding that there was no failure of the consideration to Guarantor (i.e., the terms of the Lease, including options) in entering into the Guaranty. For these reasons, the trial court did not abuse its discretion in denying Guarantor's cause of action for rescission.

C.      *Prevailing Party*

As a general rule, "a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) Code of Civil Procedure section 1032, subdivision (a)(4) defines a "prevailing party" to include: "[T]he party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. If any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed, may apportion costs between the parties on the same or adverse sides pursuant to rules adopted under Section 1034."

Here, the trial court ruled that PRE was "the prevailing party against [Guarantor] and Bar West[.]"[18] On appeal, Appellants contend that the trial court erred in this determination.

Appellants begin their six-page argument with the following introduction: "After it vacated a portion of the Jury's verdict in favor of Bar West, the Trial Court concluded, *based entirely on its prior erroneous rulings*, and the amount recovered at Trial by [PRE], that [PRE] was the prevailing party." (Italics added.) The premise for Appellants' argument is that the trial court based its prevailing party determination on "prior erroneous rulings." However, because Appellants have not demonstrated any prior

---

[18]     Although the judgment does not contain an award of costs in favor of or against Plotts, it determined that Paul W. Plotts and TBP Financial were each a prevailing party on Appellants' cross-complaint. There are no issues on appeal as to costs related to Plotts, Paul W. Plotts, or TBP Financial.

erroneous rulings by the trial court,[19] Appellants have not met their burden of establishing trial court error in determining the prevailing party.

D.      *Prejudgment Interest*

Civil Code section 3287 provides for an award of prejudgment interest to a claimant who is entitled to recover damages.  Subdivision (a) entitles the claimant to an award of interest from the time a right to recover arises where the damages are "certain, or capable of being made certain by calculation."  Subdivision (b) allows an award of interest, in the court's discretion, "but in no event earlier than the date the action was filed" if the damages are "based upon a cause of action in contract where the claim was unliquidated."

Here, the trial court ruled that PRE "is entitled to prejudgment interest from November 2013 through August 2018."  The court calculated PRE's net damages ($182,210.57) and set the annual rate at 10 percent simple interest.

As to entitlement, Appellants argue that, since "[*PRE*] *is not the prevailing party on any of the claims in this action*, it was in error for the

_____

19      Nor have Appellants made a sufficient showing of any sort of "contemporaneous" error in the court's prevailing party determination.  Appellants argue that the court did not properly consider what they characterize as their Civil Code section 1717, subdivision (b)(2) tender of, and attempt to deposit in court, "the full amount to which [the plaintiff] was entitled" at the beginning of the case.  However, by the limited record before us, Appellants have failed to overcome the presumption of correctness that attaches to the judgment on appeal.  (*Jameson, supra*, 5 Cal.5th at p. 609.)  To prevail on a Civil Code section 1717, subdivision (b)(2) claim, the defendant must "allege[] in his or her answer that he or she tendered to the plaintiff the full amount . . . ."  Here, Appellants do not mention this requirement in their briefing, and by failing to provide a copy of their answer to PRE's complaint (or copies of the pleadings in support of and in opposition to their November 2015 application to deposit funds), Appellants again have failed to overcome the presumption of correctness that attaches to the judgment.  (*Jameson*, at p. 609.)

37

Trial Court to award it prejudgment interest." (Italics added.) Once again, however, because Appellants cannot establish the premise of their argument, their conclusion necessarily fails.

Appellants next argue that, even if PRE is entitled to prejudgment interest, because PRE "fail[ed] to mitigate its damages, [PRE] is not entitled to an award [of] prejudgment interest." However, Appellants' unsupported statement regarding PRE's failure to mitigate its damages is contradicted by the record. At trial, PRE's expert provided opinion testimony as to "[PRE's] responsibility to mitigate" damages, including the date on which PRE's duty to mitigate first arose, and PRE's compliance with this responsibility.[20]

Further, Appellants contend that the trial court erred in using November 2013 as the date on which the interest began accruing. Relying on *Civil Code section 3287, subdivision (b)*, Appellants argue that, because PRE did not file this action until August 2015, "the proper calculation of prejudgment interest must be based upon a specific fixed point in time for breach that **cannot be earlier than the date the action was filed**." Significantly, however, there is no indication that the trial court awarded interest pursuant to Civil Code section 3287, subdivision (b), which applies only to unliquidated contract claims. The court did not provide the statutory basis for its award, and Appellants have not provided a record on appeal that contains copies of the arguments and evidence presented to the court during

---

[20]    More specifically, Appellants argue that PRE "could have [mitigated its damages] by allowing Bar West to assign its Lease and liquor license to [Buyer] in September [of] 2014." Regardless of the accuracy of that statement, Appellants have provided no authority—and we are unaware of any—that allows the breaching party to dictate how the injured party must respond to mitigate damages properly.

38

the post-verdict proceedings at which the interest was awarded.[21]  Thus, Appellants have failed again to overcome the presumption of correctness that attaches to the judgment on appeal.  (*Jameson, supra*, 5 Cal.5th at p. 609.)

Finally, we reject Appellants' complaint that the record of proceedings lacks factual findings regarding the interest award, since there is no requirement that the court make findings in these post-verdict proceedings. (Code Civ. Proc., § 632 [statement of decision may be requested in any "trial of a question of fact"]; *Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1294 ["a statement of decision is not required upon decision of a motion"; attorney fees motion].)

For the foregoing reasons, Appellants did not meet their burden of establishing that the trial court improperly awarded prejudgment interest to PRE.

---

[21]    At oral argument, Respondents' counsel told us that, in fact, PRE sought prejudgment interest pursuant to the terms of the Lease, not pursuant to Civil Code section 3287.  All that matters to us is that *Appellants*, as the parties challenging the trial court's ruling, have not included in the record on appeal the documents from which we can determine whether the court erred.  (*Jameson, supra*, 5 Cal.5th at p. 609.)

## IV.  DISPOSITION

The judgment is affirmed.  Plotts and PRE are entitled to their respective costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)

IRION, J.

WE CONCUR:

McCONNELL, P. J.

BENKE, J.